Nicholas J. Kittleson
9058 Dewberry Street
Anchorage, Alaska 99502
(907) 345-0830 phone
(907) 243-0125 fax
Attorney for the Plaintiff

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JANET D. LEWIS | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| MICHAEL W. WYNNE, Acting Secretary | ) |
| of the United States Air Force; LEE | ) |
| TOMLINSON, SUSAN FALLON, AL | ) Case No.: 3:06-cv-53 |
| BARTZ, COL. GARY DZUBILO, LT. | ) |
| COL. DAVID AUPPERLE, TONY | ) |
| KOBUSSEN, DIANNE HARRISON, | ) |
| COL. ROBERT DOUGLAS, KATHY | ) |
| DESHASIER, COL. SCOTTY LEWIS, | ) |
| CHELLEY CORREA, SUSAN SPEROFF, | ) |
| TRINA PAULEY, and MARY | ) |
| BARKLEY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SECOND AMENDED COMPLAINT & DEMAND FOR JURY TRIAL

### (42 U.S.C. §2000e-2(a)(1), §2000e-2(a)(2), §2000e-3(a), and §1981)

COMES NOW Plaintiff Janet Lewis, by and through counsel Nicholas Kittleson, and alleges and complains as follows:

### JURISDICTION

1. This Court has jurisdiction of the matter under the doctrine of federal question: 8 U.S.C. §1332; §1334(a)(4) and FRCP 8(a)(1).

2. This Court has jurisdiction of the tort claims under Federal Supplemental Jurisdiction: 28 U.S.C. §1367.

<u>VENUE</u>

3. Venue with this Court is proper under 28 U.S.C. §1391(e).

<u>FACTS COMMON TO ALL CLAIMS</u>

4. Ms. Lewis is an employee of the United States Air Force, 3rd Wing, at Elmendorf Air Force Base in Anchorage, Alaska, and has been during all relevant times.

5. Mr. Wynne is the Acting Secretary of the United States Air Force, and is named as the representative party of the United States Air Force.

6. Ms. Lewis' race is African American.

7. Mr. Tomlinson's race is Caucasian.  Mr. Tomlinson served as chief of Pacific Command Air Forces ("PACAF") services of the United States Air Force.  He was acting in such capacity at all times discussed.

8. Ms. Fallon's race is Caucasian.  Ms. Fallon is employed as the child development program manager for 3rd services wing of the United States Air Force.  She was acting in such capacity at all times discussed.

9. Mr. Bartz' race is Caucasian.  Mr. Bartz was the flight chief for family member services at the 3rd services wing of the United States Air Force.  He was acting in such capacity at all times discussed.

10. Lieutenant Colonel Gary Dzubilo's race is Caucasian.  Lt. Col. Dzubilo served as a commander of the third services wing of the United States Air Force.  He was acting in such capacity at all times discussed.

11. Lieutenant Colonel David Aupperle's race is Caucasian.  Lt. Col. Aupperle replaced Lt. Col. Dzubilo as the services commander of the third wing of the United States Air Force.  He was acting in such capacity at all times discussed.

12. Tony Kobussen's race is Caucasian.  Mr. Kobussen is the deputy chief of the third services wing of the United States Air Force.  He was acting in such capacity at all times discussed.

13. Dianne Harrison's race is Caucasian.  Ms. Harrison is the supervisor of employee relations for third wing of the United States Air Force.  She was acting in such capacity at all times discussed.

14. Col. Robert Douglas' race is Caucasian.  Col. Douglas is the mission support group commander of the third services wing of the United States Air Force.  He was acting in such capacity at all times discussed

15. Kathy DeShasier's race is Caucasian.  Ms. DeShasier took Mr. Bartz' position as the flight chief for family member services at the 3rd services wing of the United States Air Force.  She was acting in such capacity at all times discussed.

16. Col. Scotty Lewis's race is Caucasian.  Col. Lewis is a third wing vice-commander of the United States Air Force.  He was acting in such capacity at all times discussed.

17. Chelley Correa's race is Caucasian.  Ms. Correa is the lead trainer and curriculum specialist for family member program.    She was acting in such capacity at all times discussed.

18. Susan Speroff's race is Caucasian.  Ms. Speroff was a training and curriculum specialist for the Family Member Program of the Unite States Air Force.   She was acting in such capacity at all times discussed.

19. Trina Pauley's race is Caucasian.  Ms. Pauley was the family child care coordinator and later the assistant director at the Sitka Child Development Center of the United States Air Force.  She was acting in such capacity at all times discussed.

20. Mary Barkley's race is Caucasian.  Ms. Barkley was the family child care coordinator and later the director at the Sitka Child Development Center of the United States Air Force.  She was acting in such capacity at all times discussed.

21. Ms. Lewis works in the Child Development Center Program on Elmendorf Air Force Base.  During March of 2002, the Upper Management of the Family Member Program, including Ms. Fallon, moved Ms. Lewis into the position of director of the Katmai Child Development Center.

22. During 2002 and 2003, the Air Force built a new child care center, the Sitka Center.  At that time, the new center was planned to be large enough to accommodate all of

the children at the Katmai Child Development center, plus all the children on the wait list.

23. Management for the Air Force, including Mr. Tomlinson, Ms. Fallon and Mr. Bartz, discouraged Ms. Lewis from applying to direct the new Sitka Center.

24. Upon information and belief, on or about August 14, 2002, Mr. Tomlinson proposed terminating Ms. Lewis, based on false claims he made about an inspection report.

25. On or about January 14, 2003, Lee Tomlinson came to Elmendorf and held a staff meeting.   Mr. Tomlinson and Susan Fallon made it clear at the meeting that they would be taking applications for director of the new center.   Mr. Tomlinson indicated that they were planning on renovating the Katmai building and would keep a program going there.  He was intending to keep Ms. Lewis and Gena Walker at Katmai.

26. During the meeting, Lee Tomlinson indicated that he wanted to "keep the teams together." Trina Pauley and Mary Barkley were working together at the Family Child Care Center.  They are both Caucasian.  Ms. Lewis and Ms. Walker were working together at Katmai.  They are both African American.

27. On or about February 28, 2003, there was a staff meeting to welcome Al Bartz as the new flight chief.  During his whole presentation, Mr. Bartz gave the same information as Mr. Tomlinson had given during the January 14, 2003 meeting including the statements about "keeping the teams together."

28. On or about February 28, 2003 Ms. Fallon told Ms. Lewis that the Sitka Center director would be a GS-11 level position and that the Katmai Center was flagged for a downgrade to a GS-9 level position.  Ms. Lewis, who was already a GS-11, told Ms. Fallon that she was interested in running the Sitka Center and suggested that Mary Barkley, who was currently a GS-9, run the Katmai Center.  Ms. Fallon discouraged Ms. Lewis from applying for the position because she "was already the director of a center."

29. On or about March 12, 2003 Ms. Lewis saw the job announcement posting for the Sitka Center Directorship position.  She applied for the position.

30. On or about April 14, 2003 the Sitka Center was opened.  Ms. Fallon instructed Ms. Lewis to move everyone, and everything needed, over to the Sitka Center the weekend before, and assume the role of director of the Sitka Center.

31.  When the Sitka Center opened, Ms. Lewis knew and had been working with all the children, parents and staff, as they were all transferred from the Katmai Center.  Ms. Lewis was fully qualified to run the Sitka Center.  Ms. Lewis opened and ran the Sitka Center, with no assistant director or technician, for two months.

32. On or about April 16, 2003, Col. Remkes (now General) took a tour of the new Sitka Center facility and told Ms. Lewis she did a wonderful job.  Charlene Marks, Maxine Henry and Ms. Fallon agreed that Ms. Lewis had done a wonderful job.

33. On or about April 16 or 17, 2003, the certification came through for the qualified candidates for the position of Sitka Center Director.   Ms. Lewis and Ms. Barkley were listed among the qualified candidates.

34. The Civilian Referral Briefs that were issued with the candidate's certification contained significant errors that decreased points toward Ms. Lewis' application, and at the same time increased points to Mary Barkley's application.

35. Ms. Lewis inquired several times of Ms. Fallon as to whether the applicant certification had come through following the April 16 time period.  Every time, Ms. Fallon denied that the certification had come through yet.

36. At some point before the hiring decision was made, Mr. Tomlinson recommended to Mr. Bartz and Ms. Fallon that they hire Mary Barkley instead of Janet Lewis, as the Director of the Sitka Center.

37. On or about April 23, 2003 Ms. Fallon and Ms. Lewis went to the personnel department to speak with Diane Harrison about an employee.  On the way there, Ms. Lewis asked Ms. Fallon again if she had received the list of candidates.  Ms. Fallon said, "no."  At the end of the meeting, Diane Harrison asked about the list of candidates.  Ms. Fallon hesitated, and then she said she had received it.  Ms. Lewis confronted Ms. Fallon saying, "I just asked you that and you told me 'no.'"  Ms. Fallon did not deny this.

38. On or about April 29, 2003, Ms. Fallon instructed Ms. Lewis that she was not going to be conducting the tour of the facility for Mr. Myers.  Mr. Myers is the Director of Air Force Services at Headquarters in Washington D.C.

39. On or about May 4-8, 2003 Mr. Myers toured Elmendorf.  Ms. Lewis was not permitted to conduct the tour because Ms. Fallon and Mr. Bartz did not want Mr. Myers to know that an African American woman had created the programs at the center, rather than the Caucasian woman with whom they intended to replace Ms. Lewis.  Ms. Lewis was the only African American that would have been part of the tour, and she was even omitted from the program schedule.

40. Upon information and belief, Mr. Bartz and Ms. Fallon reviewed the applicant's referral briefs and scored the applicants based on information contained in those briefs.

41. Mr. Bartz and Ms. Fallon knew the information contained in the briefs was not accurate.

42. Even though the information contained in the briefs was inaccurate, and falsely inflated Ms. Barkley's score and deflated Ms. Lewis' score, Ms. Lewis still scored higher than Ms. Barkley.

43. On or about May 9, 2003, Mr. Bartz and Ms. Fallon conducted the interview with Ms. Lewis for the Sitka Center director position.

44. Although interviews for the type of position would normally be conducted by a panel of three, Mr. Bartz and Ms. Fallon were the only people that conducted the interview and scored the candidates.

45. The most likely and eligible third person to sit on the panel would have been the director for the Denali Center, Fennis Baker-Waters.  Ms. Baker-Waters is an African American woman.

46. During the interview, Ms. Fallon took notes on some of Ms. Lewis' answers.  Mr. Bartz did not take notes.  He only made a check mark now and then on his question sheet.  Mr. Bartz left the interview several times to take cell phone calls.  Ms. Fallon continued the interview in Mr. Bartz' absence.

47. On or about May 21, 2003, Ms. Lewis attended a meeting with Susan Fallon, Lee Tomlinson and Maj. Stan Bybee.  During this meeting Ms. Fallon and Mr. Tomlinson began to discuss a Caucasian employee, Judy Jocoby, that Ms. Fallon admitted was not qualified for the job.  Mr. Tomlinson stated that they could always bring her through the back door.

48. Chelley Correa was another Caucasian woman that was not qualified for her position. Despite Ms. Correa's refusal to pay for her own education to complete her qualifications, management never took employment action against her.

49. On or about May 23, 2003, Mr. Bartz made his selection of Ms. Barkley for the position of Sitka Center Director.  Ms. Lewis was not selected.

50. On that same day, Mr. Bartz and Ms. Fallon met with Ms. Lewis to inform her of the decision to hire Mary Barkley to run the Sitka Center.  Ms. Fallon stated, "the scores were very close."  Ms. Lewis asked what the deciding factor was.  Mr. Bartz became noticeably upset.  He sat up straight in his chair, his complexion changed and said in a harsh tone that he had cleared everything through the personnel department including the questions and the matrix and that he does not discuss employees with other employees.  Ms. Lewis asked to see her own matrix.  Mr. Bartz said that he would not share that information, and that Ms. Lewis would need to contact the personnel department.

51. On or about May 27, 2003 Ms. Lewis met with Jeanne Johnson in the personnel department.  Ms. Lewis asked Ms. Johnson for a copy of her matrix from the Sitka Center Director interview.  Ms. Johnson said that the supervisors, Ms. Fallon and Mr. Bartz had the information, and the personnel department did not have it.

52. Between May and September, 2003 Ms. Lewis made bi-weekly trips back and forth between personnel, Mr. Bartz and Ms. Fallon asking to review the matrix.  Each one of them claimed that the other had them.  It was not until Investigator Ross issued his report that Ms. Lewis finally saw the interview matrix, where it was attached to the report.

53. At some point, significantly after the interview, Mr. Bartz and Ms. Fallon filled in the matrix. Some of the information that had been written on the matrices was not Ms. Lewis' answers. Some of the information was either inaccurate, not what Ms. Lewis had stated, and in some cases, could not have been known until after the interview since the events described had not even occurred at the time of the interview.

54. On or about May 27, 2003 Ms. Lewis went to the Equal Employment office of the Air Force and made a complaint that illegal racial discrimination was involved in the selection of Ms. Barkley over Ms. Lewis.

55. On or about May 29, 2003, Ms. Lewis received her annual appraisal from Ms. Fallon. Ms. Lewis received five "9"s and four "8"s, which was less than she had received last time. Appraisals are usually done on the first part of April. Ms. Lewis questioned Ms. Fallon about her ratings and why they had been lowered and why had this not been discussed. Ms. Fallon stated that Ms. Lewis needed to improve in these areas and that she was showing signs of improvement. This directly contradicted the evaluation in that it contained scores that were lower than both previous annual appraisals.

56. On or about June 13, 2003 Susan Fallon presented several task lists to Ms. Lewis. The lists included training Ms. Barkley on how to run the Sitka Center.

57. Ms. Fallon gave Ms. Lewis a deadline of June 20, 2003 to leave the Sitka Center. Ms. Lewis moved over to the main building on or about that date.

58. On or about June 25, 2003 Ms. Lewis was working in the main building. Ms. Fallon came into Ms. Lewis' office and began yelling at Ms. Lewis that she could not move Gena Walker and Rosa Adams (Asian American) over to the main building. Ms. Lewis explained that this is what she understood was supposed to happen based on all previous conversations with Ms. Fallon, Mr. Bartz and Lee Tomlinson about keeping the teams together and that Ms. Lewis and Ms. Walker would be moved back to Katmai. Ms. Fallon continued to yell at Ms. Lewis, and Ms. Lewis said that Ms. Fallon was lying.

59. Ms. Fallon left Ms. Lewis' office.  A few minutes later Ms. Fallon came back and apologized to Ms. Lewis.  Ms. Lewis accepted the apology and also apologized.

60. On or about June 27, 2003, Ms. Fallon wrote up Ms. Lewis in her employment disciplinary file (form "971") for what had happened on June 25, 2003.

61. Previous to having filed an EEO complaint, Ms. Lewis had never been written up.

62. Ms. Lewis had never even received a warning of disciplinary action.  All previous remarks from Susan Fallon had been complimentary of Ms. Lewis.

63. On or about July 1, 2003, Ms. Fallon brought a survey to Ms. Lewis and instructed her to have the staff at Sitka complete the survey to see who wanted to go back and work at Katmai.  Ms. Fallon instructed Ms. Lewis not to have Ms. Walker complete the survey because she would be going back to Katmai regardless.

64. On or about July 10, 2003, Mr. Bartz sent an email to Ms. Fallon suggesting that Ms. Lewis handle the playground certification training because "she is currently the only Playground Certified person on board."  The same day, Ms. Fallon forwarded the emails to Ms. Lewis with the instruction that she was to be the "Point of Contact" ("POC") for this task.

65. Chelley Correa and Shirley Rogers are the training and curriculum specialists (both are Caucasian women).  Ms. Correa and Ms. Rogers should have been the ones tasked with acting as the POC for the trainings to prepare for the inspection.

66. Ms. Lewis was working on the renovations of Katmai, looking for a location for the preschool and hiring for the preschool, ordering and preparing everything for Katmai reopening.  Ms. Lewis' assistants, Ms. Walker and Ms. Adams, were taken away from Ms. Lewis to assist Ms. Barkley in learning how to manage the Sitka Center.  Ms. Lewis also had surgery scheduled for that time period, as Ms. Fallon was aware.  Ms. Lewis was overwhelmed.  Ms. Lewis emailed Ms. Fallon that she was working on Katmai's reopening and asked to have someone else take the lead.

67. Ms. Fallon emailed Ms. Lewis back and said she knew Ms. Lewis had an upcoming surgery so Ms. Fallon would handle billeting, but that Ms. Lewis would have to do the rest when she got back.  Ms. Lewis replied to the email stating that she was the only

one working on Katmai and the Part Day Preschool Program, and asked if there was somebody else who could handle the task.  Ms. Fallon responded that since Ms. Lewis has playground certification, and it will not take much time, Ms. Lewis should still handle it.

68. On or about August 12, 2003, Ms. Lewis came back in to work following her surgery.  She emailed Ms. Fallon again that her plate was full, and asked if someone else could handle the playground training task.  She also let Ms. Fallon know that her playground safety certificate had expired.  Mr. Bartz and Ms. Fallon insisted that Ms. Lewis organize the training.

69. Ms. Lewis began to spend extra hours at the main office to get everything done.  She would come in after dinner and work a couple extra hours per night.  She would also come in early, about 7:00 a.m. once or twice per week.  Ms. Lewis would also work some weekend mornings to get everything accomplished.  Ms. Lewis's office was right next door to Susan Fallon.  She never saw Ms. Fallon come in and work extra hours during that time.  Ms. Lewis was paid salary and received no additional compensation for the after hours and weekend work.

70. Previous to filing her EEO complaint, Ms. Lewis had never been tasked with so much work that she had to spend nights, early mornings and weekends trying to get everything accomplished that management had directed her to do.

71. On or about August 13, 2003 Diane Harrison responded to an email forwarded from Ms. Fallon containing copies of the playground safety training issue.  Ms. Harrison advised Ms. Fallon to give Ms. Lewis "direct orders" and to take "appropriate action" when she does not do what she is told to do.  Ms. Harrison counseled Ms. Fallon to be prepared for EEO claims, and acknowledged that the actions appear to be reprisals for Ms. Lewis filing an EEO claim.  Mr. Bartz' response indicated he has reviewed Ms. Harrison's advice, and Col. Gary Dzubilo's response indicated his approval.

72. Ms. Lewis successfully organized the playground safety training.

73. On or about August 25, 2003, Ms. Fallon and Mr. Bartz harassed Ms. Lewis about her travel plans for attending a conference in Japan.  Mr. Bartz and Ms. Fallon sided with

the Caucasian employees, Mary Barkley and Susan Long about travel despite the fact
that Ms. Lewis and Ms. Baker-Waters (also African American) had located a cheaper
route.

74. Ms. Lewis' workload continued to increase. She had never been given so much work
previous to her filing her EEO complaint.

75. On or about October 13, 2003 Ms. Lewis had to visit Dr. Dale Trombley for work
related stress and anxiety.

76. On or about October 17, 2003, Ms. Fallon instructed Ms. Lewis to stay out of the
Sitka Center building.

77. On or about October 30, 2003, Ms. Lewis met with Tony Kobussen to inform him
that she was being overworked and treated different than other employees and that the
treatment was unfair and punitive. Ms. Lewis explained to Mr. Kobussen that Ms.
Fallon and Mr. Bartz were tasking her with extra work. Mr. Kobussen promised to
review and get back with Ms. Lewis, but he never did.

78. On or about November 14, 2003, Ms. Fallon returned a number of work orders
("332s") to Ms. Lewis. Ms. Fallon would not accept the 332s unless Ms. Lewis
included detailed maps, diagrams and photos.

79. Nobody informed Ms. Lewis or Ms. Adams that there had been a change to the
policies for completing the 332s. Mr. Bartz and Ms. Fallon issued no policies for
correctly completing form 332.

80. Rosa Adams had completed the 332s and had been doing them for years. Ms. Adams
had not done anything different on these than on those previously submitted and
accepted. Nevertheless, Ms. Lewis would add the requested information to her 332s
and resubmit.

81. Even with the additional information, Ms. Fallon continually returned the 332s for
additional information or clarification. Ms. Lewis asked both Nancy Veasey and
members of Civil Engineering about her 332 forms, and both indicated the
information was sufficient.

82. Employees who were Caucasian and/or had not filed EEO claims were also filing 332 forms without all the information being asked of Ms. Lewis, and their forms were not returned to them.

83. Ms. Lewis had not had any 332 forms returned to her until after filing her EEO claim.

84. On or about November 18, 2003, Ms. Lewis received an email from Ms. Fallon regarding the 332s and getting together to discuss them.

85. On or about November 19, 2003, Ms. Lewis met with Ms. Fallon, Gena Walker and Rosa Adams. Ms. Fallon instructed Ms. Lewis to just wait and not do anything further with respect to the 332s to see what the contractors were going to repair and put back into place for the renovation. Ms. Fallon even wrote this on a sticky note and attached it to the 332s.

86. Ms. Lewis repeatedly went up the chain of command to Tony Kobussen, explaining her overload of work. Mr. Kobussen would assure Ms. Lewis that he would talk to Ms. Fallon and get back with Ms. Lewis. The only thing that came back to Ms. Lewis was more work. Ms. Lewis learned that when Mr. Kobussen would talk to Ms. Fallon, Ms. Fallon would task Ms. Lewis with more work.

87. Ms. Fallon continually sought ways to thwart Ms. Lewis, Gena Walker and Rosa Adams's progress of getting Katmai reopened. Upon information and belief, Ms. Fallon was instructed by Mr. Bartz and Mr. Tomlinson to find a reason to terminate Ms. Lewis. Ms. Fallon had never treated Ms. Lewis this way previous to Ms. Lewis filing her EEO complaint. Communication from Ms. Fallon to Ms. Lewis had changed into a confrontational style rather than the facilitative style Ms. Fallon had used previous to the filing of the EEO complaint.

88. On or about December 18, 2003, Ms. Fallon came into Ms. Lewis' office and asked Ms. Lewis to review a number of different issues regarding the Katmai facility that Ms. Lewis had already discussed with Ms. Fallon. Ms. Fallon appeared to be acting like she did not understand the information that Ms. Lewis was presenting, and was looking for an argument. It appeared to Ms. Lewis that Ms. Fallon was not really

interested in knowing the information, but instead, trying to confuse and harass her and get her upset.

89. Following that confrontation, Ms. Lewis completed a written request for sick leave because she was feeling stressed by Ms. Fallon's attempts to get an argument started. Susan Fallon denied the request.  When Ms. Fallon reviewed the reason Ms. Lewis put for requesting the leave, Ms. Fallon became angry and denied the request, stating that the reason Ms. Lewis put on her request was not legitimate.

90. Ms. Lewis went to meet Dr. Bacon during her lunch time for help in coping with the stress and anxiety.  Dr. Bacon wrote her a note to give to Ms. Fallon stating that Ms. Lewis needed to take the rest of the afternoon off.

91. Ms. Lewis took the doctor's note back to Ms. Fallon.  Ms. Fallon first discussed the matter with Dianne Harrison in personnel.  Following the discussion, Ms. Fallon would only let Ms. Lewis leave if she wrote another request that did not state the reason she was requesting the leave.

92. On or about December 18, 2003, Ms. Baker-Waters requested sick leave and did not indicate any reason on her form.  The request was approved.

93. On or about December 18, 2003, Ms. Barkley took time off for sick leave.  The next day she filed her request did not indicate any reason on her form.  The request was approved.

94. On or about January 29, 2004, a meeting was held at Tony Kobussen's office.  Mr. Bartz, Mr. Kobussen and Ms. Fallon were there with Ms. Lewis.   Mr. Bartz stated "There is a group that has proven themselves to him and there is a group that hasn't." The group that had proven themselves included everybody except Ms. Lewis, Ms. Walker and Ms. Adams - the three minorities that management had displaced for a year.

95. During that meeting Ms. Lewis told management that it was just shocking how many times Ms. Lewis, Ms. Walker and Ms. Adams have been ignored by management despite the fact that they are there every day and managers are walking back and forth in front of Ms. Lewis', Ms. Walker's and Ms. Adam's offices.  Ms. Lewis said, "You

don't have anything to do with us. You even stop conversations when we come up and walk away." The managers had no explanation for this.

96. That same day, after the meeting, Susan Fallon came downstairs on the way to her office and swung open Ms. Walker's and Ms. Adam's door. She said "hey you" to Ms. Walker and "hey you" to Ms. Adams and slammed the door closed and left.

97. On or about January 30, 2004, Ms. Lewis called Chelley Correa and scheduled to use a room at the Sitka center for series of staff training meetings in February. Ms. Lewis emailed Ms. Correa a schedule.

98. Later that day Ms. Correa called Ms. Lewis back and stated that those dates were OK.

99. On or about February 13, 2004 Ms. Lewis started to go to the training room where she had scheduled the trainings to take place. Jill Ponti, the clerk, stopped Ms. Lewis and told her that the meeting has been moved to the assistant director's office in the same building. Ms. Lewis asked "Why?" Ms. Ponti said that Trina Pauley and Mary Barkley had scheduled something for that room.

100. Ms. Lewis went to the assistant director's office and met her staff, Theresa Almazan and Jennifer Jones. The room was too small to conduct the training and develop lesson plans, as they needed a large table and more workspace. Ms. Lewis found Mary Barkley in the room she had reserved and politely asked Ms. Barkley if she could speak with her in private. Ms. Barkley began to discuss the matter there in the lobby in front of everyone. Ms. Barkley said that she needed the room for a Developmental Training Module. Ms. Lewis asked if they could continue the conversation in Ms. Barkley's office. Once in Ms. Barkley's office, Ms. Lewis explained that she needed the large room, too, and pointed out that she had reserved the room. Ms. Barkley responded with a curt, "fine" and stormed out. Ms. Lewis was then able to use the training room.

101. On or about February 17, 2004, Ms. Lewis' part day preschool program was housed at the Sitka building at that time because of the renovations happening at Katmai. Ms. Lewis wanted to talk to Mary Barkley about the fact that the rooms were filthy every day. She did not understand why the rooms were not being cleaned since they had a

contract for cleaning.  Ms. Barkley would not talk to Ms. Lewis.  So Ms. Lewis

contacted Ms. Fallon.  Once Ms. Lewis spoke with Ms. Fallon, Ms. Fallon spoke to

Ms. Barkley.  Only once this happened, did Ms. Barkley resolve the cleanliness

problem with the custodian.

102. On or about March 1, 2004, Ms. Fallon wrote up Ms. Lewis for what happened on

February 13, 2004 and February 17, 2004.

103. On or about March 4, 2004, Ms. Fallon called Ms. Lewis into her office to discuss

her recent write-up on Ms. Lewis' 971 form.  Ms. Fallon accused Ms. Lewis of

"explosive and unprofessional behavior." (dated March 1, 2004).  Regarding the first

incident, five witnesses submitted written statements, four of which were that Mary

Barkley was the one who seemed upset and that Ms. Lewis acted professionally.  The

fifth one was submitted by Mary Barkley's assistant, Trina Pauley.  Also, there was

no dispute that the custodian had not been doing his job and that it was right and

proper for Ms. Lewis to bring this to Ms. Barkley's attention, or that it was right and

proper for Ms. Lewis to go up the chain and speak with Ms. Fallon when Ms. Barkley

would not discuss the issue with Ms. Lewis.  Despite all the evidence that Ms. Lewis

had been in the right for both incidents, Ms. Fallon kept the write-up in Ms. Lewis'

employment file on the 971 form.

104. On or about May 11, 2004, Ms. Fallon wrote up Ms. Lewis over the work orders

(332s) issue.  Ms. Lewis had not done anything with them because Ms. Fallon had

instructed her, both orally and in writing, to hold off on doing anything further with

them.  Nevertheless, Ms. Fallon still added a negative comment that Ms. Lewis had

failed to follow her instructions in Ms. Lewis' employment records on the 971 form.

105. On or about May 4, 2004, Lt. Col. Dzubilo requested that Ms. Lewis meet with him.

Ms. Lewis brought her personal EEO representative, Ibraahiym Kadessh, to the

meeting.  When Mr. Kadessh introduced himself to Lt. Col. Dzubilo and explained

who he was and that he was with Ms. Lewis, Lt. Col. Dzubilo cancelled the meeting.

Lt. Col. Dzubilo stated he wanted to meet with Ms. Lewis alone.

106. On or about May 6, 2004 Lt. Col. Dzubilo met with Ms. Lewis without her EEO representative present. Lt. Col. Dzubilo had Mr. Kobussen attend the meeting as his witness. Lt. Col. Dzubilo badgered and threatened Ms. Lewis, and contrary to his letter stating that it was not intended to be a disciplinary meeting, it was a meeting to discipline Ms. Lewis.

107. On or about June 4, 2004, Ms. Fallon placed more negative comments in Ms. Lewis' employment file for discussing possible employment openings with an employee. Ms. Lewis, in speaking with this employee, had been following instructions from management in encouraging people to apply for position openings.

108. During June of 2004, Ms. Lewis was returned to Katmai to reopen the center. The Katmai facility, although renovated, still retained problems including mold, ineffective heating and cooling, inadequate ventilation and no sprinkler system.

109. On or about June 18, 2004, Ms. Lewis received her annual appraisal. Her ratings were significantly lower. Previous to filing her EEO claim, they had been "8"s and "9"s, except during the period where she had just started working at Elmendorf. Now her scores were all in the central and low range. Additionally she was not recommended for a bonus, and did not receive an increase in pay for the first time since beginning work at Elmendorf.

110. By October of 2004, the segregation of the Sitka and Katmai facilities between minority employees and Caucasian employees had been completed. The brand new Sitka Center is staffed almost exclusively by Caucasian employees. The Katmai Center is staffed almost exclusively by minority employees.

111. When Ms. Lewis attempted to hire Caucasian employees, during the hiring process they were regularly redirected to the Sitka facility.

112. Management failed to request funds for the Katmai center. The Sitka Center was fully funded. While Ms. Barkley spent money on frivolous and outrageously expensive décor, Ms. Lewis was reprimanded for purchasing flame retardant materials to put curtains up in the Katmai facility.

113. Management determined that the Katmai facility was to be a facility for infants and toddlers, which guaranteed that the center would lose money. Ms. Lewis made recommendations on how to balance the centers so her center could at least break even. Despite ignoring Ms. Lewis' suggestions, and implementing a program that by design would lose money, Ms. Fallon and Mr. Bartz and Ms. DeShasier put pressure on Ms. Lewis to explain the losses suffered by the Katmai Center.

114. During October of 2004 Ms. Lewis spoke with the Pattersons, parents of one of the children at Katmai. The Pattersons stated that they would like to move their child to the Denali Child Development Center. While processing the request, they learned that Mr. Patterson had lost his job. Policy required both parents to be working or in school. The family requested a 30 day extension. In the meantime, the clerk had found a place at Denali. But Denali decided not to take the child, so they were talking about and making arrangements in the Sitka Center. Ms. Lewis, under pressure from management to keep her open rooms filled, gave the slot to another family on the waiting list for a newborn that was due in February, 2005.

115. The Patterson child went to the Sitka Center and never went without day care.

116. On or about October 6, 2004, Ms. Lewis was out on personal leave. A child left the Katmai Center without anybody seeing her do so. Since Susan Fallon was the person responsible for the Katmai Center when Ms. Lewis was out, Ms. Fallon conducted the initial investigation into what happened, including talking with the caregivers, Teresa Almazan and Lisa Taylor.

117. On or about October 12, 2004, Ms. Lewis came back from her leave. Ms. Fallon came over to the Katmai Center and met with Ms. Lewis. They discussed the event where the child had left the Katmai Center. Ms. Fallon gave Ms. Lewis the Douglas factors (guidelines for determining discipline) and instructed Ms. Lewis to discipline the caregivers based on the Douglas factors. Ms. Lewis asked that since Ms. Fallon was the supervisor during the incident, shouldn't she be the one to discipline the caregivers? Ms. Fallon said no, that Ms. Lewis should conduct the discipline. Ms. Lewis said OK.

118. On or about October 13, 2004, Ms. Lewis determined that retraining would be the appropriate disciplinary action.

119. On or about October 18, 2004 Ms. Fallon called Ms. Lewis and asked about the discipline given to Ms. Almazan and Ms. Taylor.  Ms. Lewis explained that after reviewing the Douglas factors, reviewing information she received from the caregivers, reviewing videotapes from the rooms, and talking with Ms. Fallon about the reactions that the caregivers had at the time of the incident, that Ms. Lewis had decided to have the caregivers retrained.  Ms. Fallon was very upset with this choice and began yelling at Ms. Lewis.  Ms. Fallon told Ms. Lewis not to do anything else with respect to discipline.

120. On or about November 1, 2004, Ms. Lewis submitted a written request to Susan Fallon to take vacation from December 19, 2004 to January 6, 2005.   The request was made to spend the holiday with her daughter, as well as be there for her daughter's birthday.

121. On or about December 1, 2004 Ms. Lewis had not heard back from Ms. Fallon regarding her vacation request.  Ms. Fallon said she could not approve leave because she did not have coverage for Ms. Lewis.

122. Ms. Lewis went up to Col. Aupperle to discuss Ms. Fallon refusing her vacation request.

123. On or about December 2, 2004, EEO counselor Schroder dropped by Ms. Fallon's office and asked her a few questions about Ms. Lewis' claims.  He also asked to do a follow-up interview with Ms. Fallon.

124. Following the meeting with Mr. Schroder, Ms. Fallon called Ms. Lewis up to her office to discuss the budget.  But when Ms. Lewis arrived, instead of discussing the budget Ms. Fallon told Ms. Lewis she was writing her up for the October 6 incident. Lewis asked, "That happened in October, why are you writing me up now?"  Ms. Fallon stated that she wanted Ms. Lewis to get back to her on the discipline given to Almazan and Taylor and discuss it with her.  But Ms. Fallon had never told Ms. Lewis that this is what she wanted her to do.

125. During the same meeting, Ms. Fallon also accused Ms. Lewis of leaving the staff meeting 15 minutes early without approval. Ms. Lewis had her parent teacher conference to attend, and had scheduled the parent teacher conference to not coincide with the meeting, and had asked for time off with a leave slip to make sure she was at the parent teacher conference on time. The managers had changed the time of the meeting from the morning to the afternoon. Ms. Fallon wrote up both incidents on Ms. Lewis' employment record, form 971.

126. On or about December 11, 2004, Ms. Fallon met with EEO Investigator John Schroder. Following that meeting, Ms. Fallon came to Ms. Lewis' office and informed Ms. Lewis that she was also going to write Ms. Lewis up for offering the Patterson child's spot to another family. Ms. Lewis explained that the Patterson child was never displaced, and never would have been displaced, since the new child was not due until February 2005, at which time the Patterson child would have aged out of the room anyway.

127. On or about December 13, 2004, Ms. Lewis' vacation leave request submitted on November 1, 2004 was approved. However, by then it was too late to obtain tickets for holiday travel. So Ms. Lewis had to postpone her vacation. She missed her daughter's birthday.

128. On or about February 4, 2005, Susan Fallon followed through with her threat and issued a written reprimand for the Patterson issue that happened in October of 2004. The disciplinary action was noted in Ms. Lewis' employment file on her 971.

129. On or about February 18, 2005, Ms. Walker informed Ms. Lewis that Susan Speroff was talking with caregivers and spreading rumors that they would not have enough baby formula for the new infants arriving the following week. Ms. Lewis reassured Ms. Walker that the infant formula had been ordered and she would let Ms. Speroff know.

130. Ms. Lewis walked into the faculty lounge and said to Ms. Speroff that when she had a chance, Ms. Lewis would like to speak with her in the office. Ms. Speroff came into Ms. Lewis' office. Ms. Lewis told Ms. Speroff that she is aware of the new arrivals

for next week and the formula needs and that it would be taken care of.  Ms. Lewis explained that even if the child arrived and the formula had not, they would get it either at the commissary or borrowed from one of the other centers.  So she need not worry, it was taken care of, and Ms. Lewis had explained this to the caregivers and they knew that Ms. Lewis knew about the issue and that it was being taken care of. The formula was delivered on time and the center has not been out of formula. Additionally, the new arrivals were on breast milk, not infant formula.  This must be provided by the mothers.

131. On or about March 15, 2005 Ms. Fallon sent a notice stating that there would be a marketing meeting the next day and that everyone was expected to attend.  Ms. Lewis had already scheduled interviews for jobs all morning.  Ms. Lewis had a new clerk who did not know that there was a meeting already scheduled at the times she scheduled the interviews.

132. On or about March 16, 2005, Ms. Lewis missed the marketing meeting because she was conducting interviews.  Ms. Lewis caught up with Ms. Fallon after the meeting and explained what happened.  Ms. Fallon was upset.  Ms. Fallon explained that this was a mandatory commanders meeting, and when one of these meetings happens, Ms. Lewis had to reschedule whatever else was going on and make the meeting.

133. The commander had not even come to his last two marketing meetings.  The commander did not come to this meeting either.  Ms. Fallon did not give any information about any important matters that were raised at the meeting.  Other people did not show up to this meeting either.  None of the others who missed the meeting received reprimands for missing the meeting.  They do not even keep rosters noting who attends the meetings.

134. On or about April 19, 2005, Ms. Fallon asked Ms. Speroff to gather information to respond to the EEO investigation.  Ms. Speroff talked to Ms. Lewis about it.  Ms. Speroff told Ms. Lewis that she did not understand why she was supposed to be helping Chelley Correa with the investigation.  Ms. Speroff was venting her frustration with having to do extra work in helping Ms. Correa.  Ms. Lewis told Ms.

Speroff if she felt like that then she should let Ms. Fallon and Ms. Correa know how she felt.

135. At some point following, and believed to be after April 19, 2005, Ms. Speroff submitted false written statements to Ms. Fallon regarding incidents of February 18 and April 19, 2005.

136. On or about June 16, 2005 Ms. Lewis received her 2005 evaluation. She received very low scores. Again, no award and no raise were given. But for some reason the line approving an award had been signed.

137. On or about July 6, 2005, Ms. Lewis began seeking treatment from Hugh Fisher, LMFT, at Good Samaritan Counseling Center to help cope with the stress and anxiety she was receiving from her superiors at work.

138. On or about July 12, 2005, Ms. Lewis requested a meeting to discuss the evaluation. Col. Douglas had invited his deputy Dianne Harrison to the meeting. Ms. Lewis asked Ms. Harrison to explain the rating criteria and how it works. Ms. Harrison explained the rater's job, the reviewers' job and if there is an award it goes up to Col. Douglas. Ms. Harrison also explained the midyear feedback. Ms. Fallon only gave the rating, but never gave the feedback. Ms. Lewis asked how she was supposed to improve from midyear since nobody was telling her what they expected of her about improvements from midyear. She did not receive an answer. Ms. Lewis inquired about the signature for the award. Col. Douglas said it happened, and it just happens sometimes, and it had happened to a lot of them. Ms. Lewis asked about why he signed off on that rating. He avoided and declined to answer the question.

139. Ms. Lewis' evaluation failed to recognize Ms. Lewis' successfully running the part day preschool program.

140. About an hour after meeting with Col. Douglas, Ms. Fallon called Ms. Lewis and tells her that she needs to have a meeting regarding suspension. This is the first time that Ms. Lewis hears anything about a suspension.

141. On or about July 14, 2005, Ms. Fallon gave Ms. Lewis a "notice of proposed suspension."

142. The notice contained statements that were false and misleading, and used those statements as a basis of justification for suspending Ms. Lewis.

143. On or about August 30, 2005, Kathy DeShasier, called Ms. Lewis into her office. Ms. DeShasier handed Ms. Lewis a copy of the suspension letter. Suspension began on August 31, 2005 and continued through September 14, 2005. The suspension was without pay. Ms. Lewis had requested a hearing and asked about a hearing. Ms. DeShasier said she spoke with legal and personnel and that she did not need to give Ms. Lewis a hearing. Ms. Lewis went back to her office and collected her things. Ms. Lewis went to see her therapist. She spent most of the night awake and in tears.

144. On or about August 31, 2005, Ms. Lewis called Nancy Veasey. Nancy Veasey told Ms. Lewis that Susan Long said Susan Speroff told her that Ms. Lewis had been suspended. Ms. Lewis had not told anybody, in fact she had just found out herself. Already the information is flowing through the office.

145. On or about September 14, 2005, Ms. Lewis reported back for work. All of the work that had come through for the two weeks of suspension had piled up on Ms. Lewis' desk, as Ms. Fallon had not done any of it. So Ms. Lewis was again overwhelmed with work, and expected to do the two weeks of work that she was not paid to do.

146. That same day Ms. Fallon contacted Ms. Lewis and told Ms. Lewis that she wanted her to come for a meeting, because Ms. Fallon was going to write up Ms. Lewis for Gena Walker missing a marketing meeting on August 17, 2005. Ms. Lewis had made a list of meetings for Gena Walker and told Ms. Walker that there would be more meetings and that either Ms. Fallon or Fennis Baker-Waters would let her know about the other meetings. Ms. Lewis told Ms. Fallon about the list. Ms. Fallon had called Ms. Walker about the meetings, but neglected to email or call her about this particular marketing meeting. Ms. Walker did not know about the meeting.

147. Ms. Fallon wanted to meet with Ms. Lewis right away. Ms. Lewis said, "no, this is harassment" and she wanted to talk to people in the chain of command.

148. Ms. Lewis was on approved leave at the time Ms. Walker missed the meeting.

149. Ms. Lewis went to see Kathy DeShasier.  Ms. DeShasier seemed to know what Ms. Fallon was doing and she approved it.

150. Ms. Lewis went to Ms. Fallon and asked to see the write up but Ms. Fallon would not give it to her.  Ms. Lewis went to see Mr. Kobussen and Col. Lewis.  They were both out.  Ms. Lewis then went to the EEO office.  Mr. Kobussen called back later that afternoon and told Ms. Lewis that they had changed the rules and only Susan Fallon needed to come to the marketing meetings, not the CDC directors.  Ms. Lewis told Mr. Kobussen that Ms. Fallon had written her up for Gena Walker missing the meeting.  Mr. Kobussen said that was not going to happen.  Ms. Lewis was so stressed out that she had to go see her therapist.  The therapist gave her some medication through a shot and had to take two days off based on the doctor's orders.

151. Ms. Walker sent an email to Ms. Fallon asking if she, too, was going to be written up for missing the meeting.  Ms. Fallon emailed her back and said "no."

152. On or about September 19, 2005, Ms. Lewis received a letter from Col. Lewis stating that instead of going up the chain of command, Ms. Lewis should just deal with the EEO office.  The chain of command approach is specifically listed in the discrimination packet on page 12.  Col. Snodgras specifically requires supervisors to respond promptly and fairly to allegations and ensure complainants are free from reprisal.  General Hestler also stated an expectation that commanders and supervisors enforce the EEO policy.

153. On or about November 16, 2005, Ms. Fallon had a meeting with Ms. Lewis to go over the midyear review.  During the conversation, Ms. Lewis asked Ms. Fallon why she relied on the word of one Caucasian person in deciding to discipline/suspend her.  Ms. Fallon indicated there was information from another person.  Ms. Lewis asked who?  Ms. Fallon said Chelley Correa.  Ms. Fallon did not and has never produced a statement from Chelley Correa.

154. Ms. Fallon marked Ms. Lewis down on element two on her midyear review, claiming that Ms. Lewis demonstrated insolence in her objections to signing Theresa Almazan's (a Katmai employee) revised performance appraisal.  Ms. Lewis had

questioned Ms. Fallon's re-writing of Theresa Almazan's performance appraisal and sought guidance from both the personnel and legal departments before signing the appraisal.

155. Ms. Lewis was also marked down on cooperation and responsiveness over Ms. Speroff's allegations of mishandling the baby formula incident even though the claim is not true and Ms. Lewis provided statements from others.

156. Under communication Ms. Lewis was marked down again for disrespectful comments in front of subordinates.  When Ms. Lewis asked her about this, Ms. Fallon said comments were made in front of Brian Seagroves.  Ms. Lewis disputed this and asked then why doesn't she have a statement from Mr. Seagroves.  Ms. Fallon stated she did not have one, and the suspension is history.  Ms. Lewis asked why then was it being used as justification for marking her down on her evaluation?

157. Under duty of performance, Ms. Fallon used the lack of formula as the reason to mark her down.  Ms. Lewis again pointed out she was taking one Caucasian person's word, but ignored the written statements of several other people showing the Katmai Center was never out of formula.  Ms. Fallon responded, "Everything was in motion then."

158. Under thoroughness Ms. Lewis was marked down for elevating up the chain of command the issue of the toilets in the facility.

159. On or about November 17, 2005 Ms. Lewis emailed Ms. Correa a question as to what accusations about Ms. Lewis that she had made to Ms. Fallon.

160. On or about November 18, 2005 Ms. Correa emailed Ms. Lewis back stating that Ms. Speroff had declined to help with the investigation because Ms. Lewis had kept Ms. Speroff at the Katmai Center.

161. Ms. Lewis had not kept Ms. Speroff at the Katmai center.  Ms. Speroff and Ms. Correa made false accusations about Ms. Lewis.

162. All conditions precedent to filing this action have been met.

## CLAIM I

VIOLATION OF TITLE VII – DISPARATE TREATMENT IN HIRING AND PROMOTION, COMPENSATION AND TERMS, CONDITIONS AND PRIVILEGES OF EMPLOYMENT:  42 U.S.C. §2000e-2(a)(1)

163. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

164. The defendants, acting in their individual capacities and as agents of the United States Air Force, discriminated against Ms. Lewis on the basis of race.

## CLAIM II

VIOLATION OF TITLE VII – DISPARATE TREATMENT IN SEGREGATION:  42 U.S.C. §2000e-2(a)(2)

165. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

166. The defendants, acting in their individual capacities and as agents of the United States Air Force, discriminated against Ms. Lewis on the basis of race.

## CLAIM III

VIOLATION OF TITLE VII – DISPARATE IMPACT IN HIRING AND PROMOTION, COMPENSATION AND TERMS, CONDITIONS AND PRIVILEGES OF EMPLOYMENT: 42 U.S.C. §2000e-2(a)(1)

167. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

168. The defendants, acting in their individual capacities and as agents of the United States Air Force, discriminated against Ms. Lewis on the basis of race.

## CLAIM IV

VIOLATION OF TITLE VII – DISPARATE IMPACT IN SEGREGATION:  42 U.S.C. §2000e-2(a)(2)

169. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

170. The defendants, acting in their individual capacities and as agents of the United States Air Force, discriminated against Ms. Lewis on the basis of race.

## CLAIM V

### VIOLATION OF TITLE VII – RETALIATION: 42 U.S.C. §2000e-3(a)

171. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

172. The defendants, acting in their individual capacities and as agents of the United States Air Force, discriminated against Ms. Lewis on the basis of her attempt to oppose unlawful employment practices.

## CLAIM VI

### VIOLATION OF 42 U.S.C. §1981 – EQUAL RIGHTS

173. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

174. The defendants, acting in their individual capacities and as agents of the United States Air Force, acted to deprive Ms. Lewis of equal rights under the law on account of her race.

## CLAIM VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

175. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

176. The defendants, acting in their individual capacities and as agents of the United States Air Force, acted intentionally to inflict emotional damage upon Ms. Lewis.

## CLAIM VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

177. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

178. The defendants, acting in their individual capacities and as agents of the United States Air Force, failed to act with reasonable care, and in doing so, inflicted emotional damage upon Ms. Lewis.

## CLAIM IX

### DEFAMATION

179. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

180. The defendants, acting in their individual capacities and as agents of the United States Air Force, through false oral and written statements, damaged Ms. Lewis.

## CLAIM X

### NEGLIGENT SUPERVISION

181. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

182. The defendants, acting in their individual capacities and as agents of the United States Air Force, failed to use reasonable care in managing and supervising their employees, and in doing so, damaged Ms. Lewis.

## CLAIM XI

### PUNITIVE DAMAGES

183. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

184. The defendants, acting in their individual capacities and as agents of the United States Air Force, acted maliciously against Ms. Lewis and/or in conscious disregard of her rights.

## DEMAND FOR TRIAL BY JURY

Ms. Lewis requests a jury trial on all issues so triable.

## REQUEST FOR RELIEF

Ms. Lewis requests the following relief:

A. For an injunction and equitable relief authorized under 42 U.S.C. § 2000e-5(g).

B. For an award of economic damages authorized under 42 U.S.C. § 2000e-5(g) in an amount to be proven at trial.

C. For an award of compensatory damages against the defendants in an amount to be proven at trial.

D. For an award of punitive damages in an amount to be proven at trial.

E. For a final judgment in favor of Ms. Lewis which (i) declares her the prevailing party on each of her claims, (ii) grants her leave to move for the maximum amount of attorney's fees and costs available under the law, and (iii) grants her the maximum amount of pre-judgment and post-judgment interest allowable by law; and

F. For a final judgment that provides Ms. Lewis with any other relief as may be just and proper under the circumstances.

Respectfully submitted this 31st day of August, 2006.

/s/ Nicholas Kittleson
Nicholas Kittleson, Esq.
ABA # 9711090
Counsel for the plaintiff
9058 Dewberry Street
Anchorage, Alaska  99502
(907) 345-0830 phone
(907) 243-0125 fax
nicholas@gci.net email

I certify that on the 31st day of August, 2006
A copy of the foregoing "Second Amended Compaint"
 was delivered electronically to:
Susan J. Lindquist, Esq.
susan.lindquist@usdoj.gov

/s/ Nicholas J. Kittleson