Nicholas J. Kittleson
9058 Dewberry Street
Anchorage, Alaska  99502
(907) 345-0830 phone
(907) 243-0125 fax
Attorney for the Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JANET D. LEWIS | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| MICHAEL W. WYNNE, Acting | ) |
| Secretary of the United States Air Force; | ) |
| and the UNITED STATES OF | ) |
| AMERICA | ) Case No.: 3:06-cv-53 |
| | ) |
| Defendants. | ) |

## THIRD AMENDED COMPLAINT & DEMAND FOR JURY TRIAL

## (42 U.S.C. §2000e-2(a)(1), §2000e-2(a)(2), §2000e-3(a); 28 U.S.C. §2674; 5 U.S.C. §7702; and 5 U.S.C. §6381 et. seq.)

COMES NOW Plaintiff Janet Lewis, by and through counsel Nicholas Kittleson, and alleges and complains as follows:

### JURISDICTION

1. This Court has jurisdiction of the matter under the doctrine of federal question: 8 U.S.C. §1332; §1334(a)(4) and FRCP 8(a)(1).

2. This Court has jurisdiction of the tort claims under Federal Supplemental Jurisdiction: 28 U.S.C. §1367 and the Federal Tort Claims Act 28 U.S.C. § 2674.

3. This Court has jurisdiction to remedy unfair employment practices by a Federal Agency employer.  5 U.S.C. § 7703(b)(2).

VENUE

4. Venue with this Court is proper under 28 U.S.C. §1391(e).

FACTS COMMON TO ALL CLAIMS

5. Ms. Lewis is an employee of the United States Air Force, 3rd Wing, at Elmendorf Air Force Base in Anchorage, Alaska, and has been during all relevant times.

6. Mr. Wynne is the Acting Secretary of the United States Air Force, and is named as the representative party of the United States Air Force.

7. Ms. Lewis' race is African American.

8. Mr. Tomlinson's race is Caucasian. Mr. Tomlinson served as chief of Pacific Command Air Forces ("PACAF") services of the United States Air Force. He was acting in such capacity at all times discussed.

9. Ms. Fallon's race is Caucasian. Ms. Fallon is employed as the child development program manager for 3rd services wing of the United States Air Force. She was acting in such capacity at all times discussed.

10. Mr. Bartz' race is Caucasian. Mr. Bartz was the flight chief for family member services at the 3rd services wing of the United States Air Force. He was acting in such capacity at all times discussed.

11. Lieutenant Colonel Gary Dzubilo's race is Caucasian. Lt. Col. Dzubilo served as a commander of the third services wing of the United States Air Force. He was acting in such capacity at all times discussed.

12. Lieutenant Colonel David Aupperle's race is Caucasian. Lt. Col. Aupperle replaced Lt. Col. Dzubilo as the services commander of the third wing of the United States Air Force. He was acting in such capacity at all times discussed.

13. Tony Kobussen's race is Caucasian. Mr. Kobussen is the deputy chief of the third services wing of the United States Air Force. He was acting in such capacity at all times discussed.

14. Dianne Harrison's race is Caucasian.  Ms. Harrison is the supervisor of employee relations for third wing of the United States Air Force.  She was acting in such capacity at all times discussed.

15. Col. Robert Douglas' race is Caucasian.  Col. Douglas is the mission support group commander of the third services wing of the United States Air Force.  He was acting in such capacity at all times discussed

16. Kathie DeShasier's race is Caucasian.  Ms. DeShasier took Mr. Bartz' position as the flight chief for family member services at the 3rd services wing of the United States Air Force.  She was acting in such capacity at all times discussed.

17. Col. Scotty Lewis's race is Caucasian.  Col. Lewis is a third wing vice-commander of the United States Air Force.  He was acting in such capacity at all times discussed.

18. Chelley Correa's race is Caucasian.  Ms. Correa is the lead trainer and curriculum specialist for family member program.    She was acting in such capacity at all times discussed.

19. Susan Speroff's race is Caucasian.  Ms. Speroff was a training and curriculum specialist for the Family Member Program of the Unite States Air Force.   She was acting in such capacity at all times discussed.

20. Trina Pauley's race is Caucasian.  Ms. Pauley was the family child care coordinator and later the assistant director at the Sitka Child Development Center of the United States Air Force.  She was acting in such capacity at all times discussed.

21. Mary Barkley's race is Caucasian.  Ms. Barkley was the family child care coordinator and later the director at the Sitka Child Development Center of the United States Air Force.  She was acting in such capacity at all times discussed.

22. Ms. Lewis worked in the Child Development Center Program on Elmendorf Air Force Base.  During March of 2002, the Upper Management of the Family Member Program, including Ms. Fallon, moved Ms. Lewis into the position of director of the Katmai Child Development Center.

23. During 2002 and 2003, the Air Force built a new child care center, the Sitka Center.

At that time, the new center was planned to be large enough to accommodate all of the children at the Katmai Child Development center, plus all the children on the wait list.

24. Management for the Air Force, including Mr. Tomlinson, Ms. Fallon and Mr. Bartz, discouraged Ms. Lewis from applying to direct the new Sitka Center.

25. Upon information and belief, on or about August 14, 2002, Mr. Tomlinson proposed terminating Ms. Lewis, based on false claims he made about an inspection report.

26. On or about January 14, 2003, Lee Tomlinson came to Elmendorf and held a staff meeting.   Mr. Tomlinson and Susan Fallon made it clear at the meeting that they would be taking applications for director of the new center.   Mr. Tomlinson indicated that they were planning on renovating the Katmai building and would keep a program going there.  He stated his intention was to keep Ms. Lewis and Gena Walker at Katmai.

27. During the meeting, Lee Tomlinson indicated that he wanted to "keep the teams together." Trina Pauley and Mary Barkley were working together at the Family Child Care Center.  They are both Caucasian.  Ms. Lewis and Ms. Walker were working together at Katmai.  They are both African American.

28. On or about February 28, 2003, there was a staff meeting to welcome Al Bartz as the new flight chief.  During his whole presentation, Mr. Bartz gave the same information as Mr. Tomlinson had given during the January 14, 2003 meeting including the statements about "keeping the teams together."

29. On or about February 28, 2003 Ms. Fallon told Ms. Lewis that the Sitka Center director would be a GS-11 level position and that the Katmai Center was flagged for a downgrade to a GS-9 level position.  Ms. Lewis, who was already a GS-11, told Ms. Fallon that she was interested in running the Sitka Center and suggested that Mary Barkley, who was currently a GS-9, run the Katmai Center.  Ms. Fallon discouraged Ms. Lewis from applying for the position because she "was already the director of a center."

30. On or about March 12, 2003 Ms. Lewis saw the job announcement posting for the Sitka Center Directorship position.  She applied for the position.

31. On or about April 14, 2003 the Sitka Center was opened.  Ms. Fallon instructed Ms. Lewis to move everyone, and everything needed, over to the Sitka Center the weekend before, and assume the role of director of the Sitka Center.

32.  When the Sitka Center opened, Ms. Lewis knew and had been working with all the children, parents and staff, as they were all transferred from the Katmai Center.  Ms. Lewis was fully qualified to run the Sitka Center.  Ms. Lewis opened and ran the Sitka Center, with no assistant director or technician, for two months.

33. On or about April 16, 2003, Col. Remkes (now General) took a tour of the new Sitka Center facility and told Ms. Lewis she did a wonderful job.  Charlene Marks, Maxine Henry and Ms. Fallon agreed that Ms. Lewis had done a wonderful job.

34. On or about April 16 or 17, 2003, the certification came through for the qualified candidates for the position of Sitka Center Director.   Ms. Lewis and Ms. Barkley were listed among the qualified candidates.

35. The Civilian Referral Briefs that were issued with the candidate's certification contained significant errors that decreased points toward Ms. Lewis' application, and at the same time increased points to Mary Barkley's application.

36. Ms. Lewis inquired several times of Ms. Fallon as to whether the applicant certification had come through following the April 16 time period.  Every time, Ms. Fallon denied that the certification had come through.

37. At some point before the hiring decision was made, Mr. Tomlinson recommended to Mr. Bartz and Ms. Fallon that they hire Mary Barkley instead of Janet Lewis, as the Director of the Sitka Center.

38. On or about April 23, 2003 Ms. Fallon and Ms. Lewis went to the personnel department to speak with Dianne Harrison about an employee.  On the way there, Ms. Lewis asked Ms. Fallon again if she had received the list of candidates for the Sitka Center Director position.  Ms. Fallon said, "no."  At the end of the meeting, Dianne

Harrison asked about the list of candidates for the Sitka Center Director position. Ms. Fallon hesitated, and then she said she had received it. Ms. Lewis confronted Ms. Fallon saying, "I just asked you that and you told me 'no.'" Ms. Fallon did not deny this.

39. On or about April 29, 2003, Ms. Fallon instructed Ms. Lewis that she was not going to be conducting the tour of the facility for Mr. Myers. Mr. Myers is the Director of Air Force Services at Headquarters in Washington D.C.

40. On or about May 4-8, 2003, Mr. Myers toured Elmendorf. Ms. Lewis was not permitted to conduct the tour because Ms. Fallon and Mr. Bartz did not want Mr. Myers to know that an African American woman had created the programs at the center, rather than the Caucasian woman with whom they intended to replace Ms. Lewis. Ms. Lewis was the only African American that would have been part of the tour, and she was even omitted from the program schedule.

41. Upon information and belief, Mr. Bartz and Ms. Fallon reviewed the applicant's referral briefs and scored the applicants based on information contained in those briefs.

42. Mr. Bartz and Ms. Fallon knew the information contained in the briefs was not accurate.

43. Even though the information contained in the briefs was inaccurate, and falsely inflated Ms. Barkley's score and deflated Ms. Lewis' score, Ms. Lewis still scored higher than Ms. Barkley.

44. On or about May 9, 2003, Mr. Bartz and Ms. Fallon conducted the interview with Ms. Lewis for the Sitka Center director position.

45. Although interviews for the type of position would normally be conducted by a panel of three, Mr. Bartz and Ms. Fallon were the only people that conducted the interview and scored the candidates.

46. The most likely and eligible third person to sit on the panel would have been the director for the Denali Center, Fennis Baker-Waters. Ms. Baker-Waters is African

American.

47. During the interview, Ms. Fallon took notes on some of Ms. Lewis' answers. Mr. Bartz did not take notes. He only made a check mark now and then on his question sheet. Mr. Bartz left the interview several times to take cell phone calls. Ms. Fallon continued the interview in Mr. Bartz' absence.

48. On or about May 21, 2003, Ms. Lewis attended a meeting with Susan Fallon, Lee Tomlinson and Maj. Stan Bybee. During this meeting Ms. Fallon and Mr. Tomlinson began to discuss a Caucasian employee, Judy Jocoby, that Ms. Fallon admitted was not qualified for the job. Mr. Tomlinson stated that they could always bring her through the back door.

49. Chelley Correa was another Caucasian woman that was not qualified for her position. Despite Ms. Correa's refusal to pay for her own education to complete her qualifications, management never took employment action against her.

50. On or about May 23, 2003, Mr. Bartz made his selection of Ms. Barkley for the position of Sitka Center Director. Ms. Lewis was not selected.

51. On that same day, Mr. Bartz and Ms. Fallon met with Ms. Lewis to inform her of the decision to hire Mary Barkley to run the Sitka Center. Ms. Fallon stated, "the scores were very close." Ms. Lewis asked what the deciding factor was. Mr. Bartz became noticeably upset. He sat up straight in his chair, his complexion changed and said in a harsh tone that he had cleared everything through the personnel department including the questions and the matrix and that he does not discuss employees with other employees. Ms. Lewis asked to see her own matrix. Mr. Bartz said that he would not share that information, and that Ms. Lewis would need to contact the personnel department.

52. On or about May 27, 2003, Ms. Lewis met with Jeanne Johnson in the personnel department. Ms. Lewis asked Ms. Johnson for a copy of her matrix from the Sitka Center Director interview. Ms. Johnson said that the supervisors, Ms. Fallon and Mr. Bartz had the information, and the personnel department did not have it.

53. Between May and September, 2003, Ms. Lewis made bi-weekly trips back and forth between personnel, Mr. Bartz and Ms. Fallon asking to review the matrix. Each one of them claimed that the other had them. It was not until Equal Employment Opportunity Investigator Ross issued his report that Ms. Lewis finally saw the interview matrix, where it was attached to the report.

54. At some point, significantly after the interview, Mr. Bartz and Ms. Fallon filled in the matrix. Some of the information that had been written on the matrices was not Ms. Lewis' answers. Some of the information was either inaccurate, not what Ms. Lewis had stated, and in some cases, could not have been known until after the interview since the events described had not even occurred at the time of the interview.

55. On or about May 27, 2003, Ms. Lewis went to the Equal Employment office of the Air Force and made a complaint that illegal racial discrimination was involved in the selection of Ms. Barkley over Ms. Lewis.

56. On or about May 29, 2003, Ms. Lewis received her annual appraisal from Ms. Fallon. Ms. Lewis received five "9"s and four "8"s, which was less than she had received last time. Appraisals are usually done on the first part of April. Ms. Lewis questioned Ms. Fallon about her ratings and why they had been lowered and why had this not been discussed. Ms. Fallon stated that Ms. Lewis needed to improve in these areas and that she was showing signs of improvement. This directly contradicted the evaluation in that it contained scores that were lower than both previous annual appraisals.

57. On or about June 13, 2003, Susan Fallon presented several task lists to Ms. Lewis. The lists included training Ms. Barkley on how to run the Sitka Center.

58. Ms. Fallon gave Ms. Lewis a deadline of June 20, 2003 to leave the Sitka Center. Ms. Lewis moved over to the main building on or about that date.

59. On or about June 25, 2003 Ms. Lewis was working in the main building. Ms. Fallon came into Ms. Lewis' office and began yelling at Ms. Lewis that she could not move Gena Walker (African American) and Rosa Adams (Asian American) over to the

main building.  Ms. Lewis explained that this is what she understood was supposed to happen based on all previous conversations with Ms. Fallon, Mr. Bartz and Lee Tomlinson about keeping the teams together and that Ms. Lewis and Ms. Walker would be moved back to Katmai.  Ms. Fallon continued to yell at Ms. Lewis, and Ms. Lewis said that Ms. Fallon was lying.

60. Ms. Fallon left Ms. Lewis' office.  A few minutes later Ms. Fallon came back and apologized to Ms. Lewis.  Ms. Lewis accepted the apology and also apologized.

61. On or about June 27, 2003, Ms. Fallon wrote up Ms. Lewis in her employment disciplinary file (form "971") for what had happened on June 25, 2003.

62. Previous to having filed an EEO complaint, Ms. Lewis had never been written up.

63. Ms. Lewis had never even received a warning of disciplinary action.  All previous remarks from Susan Fallon had been complimentary of Ms. Lewis.

64. On or about July 1, 2003, Ms. Fallon brought a survey to Ms. Lewis and instructed her to have the staff at Sitka complete the survey to see who wanted to go back and work at Katmai.  Ms. Fallon instructed Ms. Lewis not to have Ms. Walker complete the survey because she would be going back to Katmai regardless.

65. On or about July 10, 2003, Mr. Bartz sent an email to Ms. Fallon suggesting that Ms. Lewis handle the playground certification training because "she is currently the only Playground Certified person on board."  The same day, Ms. Fallon forwarded the emails to Ms. Lewis with the instruction that she was to be the "Point of Contact" ("POC") for this task.

66. Chelley Correa and Shirley Rogers are the training and curriculum specialists (both are Caucasian women).  Ms. Correa and Ms. Rogers should have been the ones tasked with acting as the POC for the trainings to prepare for the inspection.

67. Ms. Lewis was working on the renovations of Katmai, looking for a location for the preschool and hiring for the preschool, ordering and preparing everything for Katmai reopening.  Ms. Lewis' assistants, Ms. Walker and Ms. Adams, were taken away from Ms. Lewis to assist Ms. Barkley in learning how to manage the Sitka Center.  Ms.

Lewis also had surgery scheduled for that time period, as Ms. Fallon was aware.  Ms. Lewis was overwhelmed.  Ms. Lewis emailed Ms. Fallon that she was working on Katmai's reopening and asked to have someone else take the lead.

68. Ms. Fallon emailed Ms. Lewis back and said she knew Ms. Lewis had an upcoming surgery so Ms. Fallon would handle billeting, but that Ms. Lewis would have to do the rest when she got back.   Ms. Lewis replied to the email stating that she was the only one working on Katmai and the Part Day Preschool Program, and asked if there was somebody else who could handle the task.  Ms. Fallon responded that since Ms. Lewis has playground certification, and it will not take much time, Ms. Lewis should still handle it.

69. On or about August 12, 2003, Ms. Lewis came back in to work following her surgery.  She emailed Ms. Fallon again that her plate was full, and asked if someone else could handle the playground training task.  She also let Ms. Fallon know that her playground safety certificate had expired.  Mr. Bartz and Ms. Fallon insisted that Ms. Lewis organize the training.

70. Ms. Lewis began to spend extra hours at the main office to get everything done.  She would come in after dinner and work a couple extra hours per night.  She would also come in early, about 7:00 a.m. once or twice per week.  Ms. Lewis would also work some weekend mornings to get everything accomplished.  Ms. Lewis's office was right next door to Susan Fallon.  She never saw Ms. Fallon come in and work extra hours during that time.  Ms. Lewis was paid salary and received no additional compensation for the after hours and weekend work.

71. Previous to filing her EEO complaint, Ms. Lewis had never been tasked with so much work that she had to spend nights, early mornings and weekends trying to get everything accomplished that management had directed her to do.

72. On or about August 13, 2003 Dianne Harrison responded to an email forwarded from Ms. Fallon containing copies of the playground safety training issue.  Ms. Harrison advised Ms. Fallon to give Ms. Lewis "direct orders" and to take "appropriate action"

when she does not do what she is told to do.  Ms. Harrison counseled Ms. Fallon to be prepared for EEO claims, and acknowledged that the actions appear to be reprisals for Ms. Lewis filing an EEO claim.  Mr. Bartz' response indicated he has reviewed Ms. Harrison's advice, and Col. Gary Dzubilo's response indicated his approval.

73. Ms. Lewis successfully organized the playground safety training.

74. On or about August 25, 2003, Ms. Fallon and Mr. Bartz harassed Ms. Lewis about her travel plans for attending a conference in Japan.  Mr. Bartz and Ms. Fallon sided with the Caucasian employees, Mary Barkley and Susan Long about travel despite the fact that Ms. Lewis and Ms. Baker-Waters (also African American) had located a cheaper route.

75. Ms. Lewis' workload continued to increase.  She had never been given so much work previous to her filing her EEO complaint.

76. On or about October 13, 2003 Ms. Lewis had to visit Dr. Dale Trombley for work related stress and anxiety.

77. On or about October 17, 2003, Ms. Fallon instructed Ms. Lewis to stay out of the Sitka Center building.

78. On or about October 30, 2003, Ms. Lewis met with Tony Kobussen to inform him that she was being overworked and treated different than other employees and that the treatment was unfair and punitive.  Ms. Lewis explained to Mr. Kobussen that Ms. Fallon and Mr. Bartz were tasking her with extra work.  Mr. Kobussen promised to review and get back with Ms. Lewis, but he never did.

79. On or about November 14, 2003, Ms. Fallon returned a number of work orders ("332s") to Ms. Lewis.  Ms. Fallon would not accept the 332s unless Ms. Lewis included detailed maps, diagrams and photos.

80. Nobody informed Ms. Lewis or Ms. Adams that there had been a change to the policies for completing the 332s.  Mr. Bartz and Ms. Fallon issued no policies for correctly completing form 332.

81. Rosa Adams had completed the 332s and had been doing them for years.  Ms. Adams

had not done anything different on these than on those previously submitted and accepted.  Nevertheless, Ms. Lewis did add the requested information to her 332s and resubmit.

82. Even with the additional information, Ms. Fallon continually returned the 332s for additional information or clarification.  Ms. Lewis asked both Nancy Veasey and members of Civil Engineering about her 332 forms, and both indicated the information was sufficient.

83. Employees who were Caucasian and/or had not filed EEO claims were also filing 332 forms without all the information being asked of Ms. Lewis, and their forms were not returned to them.

84. Ms. Lewis had not had any 332 forms returned to her until after filing her EEO claim.

85. On or about November 18, 2003, Ms. Lewis received an email from Ms. Fallon regarding the 332s and getting together to discuss them.

86. On or about November 19, 2003, Ms. Lewis met with Ms. Fallon, Gena Walker and Rosa Adams.  Ms. Fallon instructed Ms. Lewis to just wait and not do anything further with respect to the 332s to see what the contractors were going to repair and put back into place for the renovation.  Ms. Fallon even wrote this on a sticky note and attached it to the 332s.

87. Ms. Lewis repeatedly went up the chain of command to Tony Kobussen, explaining her overload of work.  Mr. Kobussen would assure Ms. Lewis that he would talk to Ms. Fallon and get back with Ms. Lewis.  The only thing that came back to Ms. Lewis was more work.  Ms. Lewis learned that when Mr. Kobussen would talk to Ms. Fallon, Ms. Fallon would task Ms. Lewis with more work.

88. Ms. Fallon continually sought ways to thwart Ms. Lewis', Gena Walker's and Rosa Adams's progress of getting Katmai reopened.  Upon information and belief, Ms. Fallon was instructed by Mr. Bartz and Mr. Tomlinson to find a reason to terminate Ms. Lewis.  Ms. Fallon had never treated Ms. Lewis this way previous to Ms. Lewis filing her EEO complaint.  Communication from Ms. Fallon to Ms. Lewis had

changed into a confrontational style rather than the facilitative style Ms. Fallon had used previous to the filing of the EEO complaint.

89. On or about December 18, 2003, Ms. Fallon came into Ms. Lewis' office and asked Ms. Lewis to review a number of different issues regarding the Katmai facility that Ms. Lewis had already discussed with Ms. Fallon. Ms. Fallon appeared to be acting like she did not understand the information that Ms. Lewis was presenting, and was looking for an argument. It appeared to Ms. Lewis that Ms. Fallon was not really interested in knowing the information, but instead, trying to confuse and harass her and get her upset.

90. Following that confrontation, Ms. Lewis completed a written request for sick leave because she was feeling stressed by Ms. Fallon's attempts to get an argument started. Susan Fallon denied the request. When Ms. Fallon reviewed the reason Ms. Lewis put for requesting the leave, Ms. Fallon became angry and denied the request, stating that the reason Ms. Lewis put on her request was not legitimate.

91. Ms. Lewis went to meet Dr. Bacon during her lunch break for help in coping with the stress and anxiety. Dr. Bacon wrote her a note to give to Ms. Fallon stating that Ms. Lewis needed to take the rest of the afternoon off.

92. Ms. Lewis took the doctor's note back to Ms. Fallon. Ms. Fallon first discussed the matter with Dianne Harrison in personnel. Following the discussion, Ms. Fallon would only let Ms. Lewis leave if she wrote another leave request that did not state the reason she was requesting the leave.

93. On or about December 18, 2003, Ms. Baker-Waters requested sick leave and did not indicate any reason on her form. The request was approved.

94. On or about December 18, 2003, Ms. Barkley took time off for sick leave. The next day she filed her request did not indicate any reason on her form. The request was approved.

95. On or about January 29, 2004, a meeting was held at Tony Kobussen's office. Mr. Bartz, Mr. Kobussen and Ms. Fallon were there with Ms. Lewis. Mr. Bartz stated

"There is a group that has proven themselves and there is a group that hasn't."  The group that had proven themselves included everybody except Ms. Lewis, Ms. Walker and Ms. Adams - the three minorities that management had displaced for a year.

96. During that meeting Ms. Lewis told management that it was just shocking how many times Ms. Lewis, Ms. Walker and Ms. Adams have been ignored by management despite the fact that they are there every day and managers are walking back and forth in front of Ms. Lewis', Ms. Walker's and Ms. Adam's offices.  Ms. Lewis said, "You don't have anything to do with us.  You even stop conversations when we come up and walk away."  The managers had no explanation for this.

97. That same day, after the meeting, Susan Fallon came downstairs on the way to her office and swung open Ms. Walker's and Ms. Adam's door.  She said "hey you" to Ms. Walker and "hey you" to Ms. Adams and slammed the door closed and left.

98. On or about January 30, 2004, Ms. Lewis called Chelley Correa and scheduled to use a room at the Sitka Center for series of staff training meetings in February.  Ms. Lewis emailed Ms. Correa a schedule.

99. Later that day Ms. Correa called Ms. Lewis back and stated that those dates were OK.

100. On or about February 13, 2004 Ms. Lewis started to go to the training room where she had scheduled the trainings to take place.  Jill Ponti, the clerk, stopped Ms. Lewis and told her that the meeting has been moved to the assistant director's office in the same building.  Ms. Lewis asked "Why?"  Ms. Ponti said that Trina Pauley and Mary Barkley had scheduled something for that room.

101. Ms. Lewis went to the assistant director's office and met her staff, Theresa Almazan and Jennifer Jones.  The room was too small to conduct the training and develop lesson plans, as they needed a large table and more workspace.  Ms. Lewis found Mary Barkley in the room she had reserved and politely asked Ms. Barkley if she could speak with her in private.  Ms. Barkley began to discuss the matter there in the lobby in front of everyone.  Ms. Barkley said that she needed the room for a Developmental Training Module.  Ms. Lewis asked if they could continue the

conversation in Ms. Barkley's office. Once in Ms. Barkley's office, Ms. Lewis explained that she needed the large room, too, and pointed out that she had reserved the room. Ms. Barkley responded with a curt, "fine" and stormed out. Ms. Lewis was then able to use the training room.

102. On or about February 17, 2004, Ms. Lewis' Part Day Preschool Program was housed at the Sitka building at that time because of the renovations happening at Katmai. Ms. Lewis wanted to talk to Mary Barkley about the fact that the rooms were filthy every day. She did not understand why the rooms were not being cleaned since they had a contractor for cleaning. Ms. Barkley would not talk to Ms. Lewis. So Ms. Lewis contacted Ms. Fallon. Once Ms. Lewis spoke with Ms. Fallon, Ms. Fallon spoke to Ms. Barkley. Only after Ms Fallon spoke with Ms. Barkley did Ms. Barkley resolve the cleanliness problem with the custodian.

103. On or about March 1, 2004, Ms. Fallon wrote up Ms. Lewis for what happened on February 13, 2004 and February 17, 2004.

104. On or about March 4, 2004, Ms. Fallon called Ms. Lewis into her office to discuss her recent write-up on Ms. Lewis' 971 form. Ms. Fallon accused Ms. Lewis of "explosive and unprofessional behavior." Regarding the first incident, five witnesses submitted written statements, four of which were that Mary Barkley was the one who seemed upset and that Ms. Lewis acted professionally. The fifth one was submitted by Mary Barkley's assistant, Trina Pauley. Also, there was no dispute that the custodian had not been doing his job and that it was right and proper for Ms. Lewis to bring this to Ms. Barkley's attention, or that it was right and proper for Ms. Lewis to go up the chain and speak with Ms. Fallon when Ms. Barkley would not discuss the issue with Ms. Lewis. Despite all the evidence that Ms. Lewis had been in the right for both incidents, Ms. Fallon kept the write-up in Ms. Lewis' employment file on the 971 form.

105. On or about March 5, 2004, Dr. Trombley completed a medical certification for Family Medical Leave Act leave for Ms. Lewis regarding how her medical problems

are related to the stress she suffers from her job. Dr. Trombley recommended that Ms. Lewis be given two weeks of medical leave. Ms. Lewis submitted form WH-380 medical certification that Dr. Trombley had completed on her behalf to personnel.

106. On or about March 12, 2004, Mr. Bartz had a meeting with Caucasian employees Shirley Rogers, Chelley Correa, Trina Pauley and Mary Barkley to complain about and criticize Ms. Lewis. Ms. Lewis was not invited to this meeting, nor did she have any knowledge of it. The Caucasian women complained to Mr. Bartz that Ms. Lewis was receiving too much positive recognition, and she was not being disciplined enough.

107. On or about April 2, 2004, M. Lyn Dixon, Civilian Personnel Officer, approved Ms. Lewis' Family Medical Leave.

108. On or about May 11, 2004, Ms. Fallon wrote up Ms. Lewis over the work orders (form 332) issue. Ms. Lewis had not done anything with them because Ms. Fallon had instructed her, both orally and in writing, to hold off on doing anything further with them. Nevertheless, Ms. Fallon still added a negative comment that Ms. Lewis had failed to follow her instructions in Ms. Lewis' employment records on the 971 form.

109. On or about May 4, 2004, Lt. Col. Dzubilo requested that Ms. Lewis meet with him. Ms. Lewis brought her personal EEO representative, Ibraahiym Kadessh (African American), to the meeting. When Mr. Kadessh introduced himself to Lt. Col. Dzubilo and explained who he was and that he was with Ms. Lewis, Lt. Col. Dzubilo canceled the meeting. Lt. Col. Dzubilo stated he wanted to meet with Ms. Lewis alone.

110. On or about May 6, 2004, Lt. Col. Dzubilo met with Ms. Lewis without her EEO representative present as directed by Lt. Col. Dzubilo. Lt. Col. Dzubilo had Mr. Kobussen attend the meeting as his witness. Lt. Col. Dzubilo badgered and threatened Ms. Lewis, and contrary to his letter stating that it was not intended to be a disciplinary meeting, it was a meeting to discipline and intimidate Ms. Lewis. Ms.

Lewis felt intimidated by the hostile and accusatory tone of Lt. Col. Dzubilo.

111. On or about June 4, 2004, Ms. Fallon placed more negative comments in Ms. Lewis' employment file for discussing possible employment openings with an employee. Ms. Lewis, in speaking with this employee, had been following instructions from management in encouraging people to apply for position openings.

112. During June of 2004, Ms. Lewis was returned to Katmai to reopen the center. The Katmai facility, although renovated, still retained problems including mold, ineffective heating and cooling, inadequate ventilation and no sprinkler system.

113. On or about June 18, 2004, Ms. Lewis received her annual appraisal. Her ratings were significantly lower. Previous to filing her EEO claim, they had been "8"s and "9"s, except during the period where she had just started working at Elmendorf. Now her scores were all in the central and low range. Additionally she was not recommended for a bonus, and did not receive an increase in pay for the first time since beginning work at Elmendorf.

114. By October of 2004, the segregation of the Sitka and Katmai facilities between minority employees and Caucasian employees had been completed. The brand new Sitka Center is staffed almost exclusively by Caucasian employees. The Katmai Center was staffed almost exclusively by minority employees.

115. When Ms. Lewis attempted to hire Caucasian employees, during the hiring process they were regularly redirected to the Sitka facility.

116. Management failed to request funds for the Katmai center. The Sitka Center was fully funded. While Ms. Barkley spent money on frivolous and outrageously expensive décor, Ms. Lewis was reprimanded for purchasing flame retardant materials to put curtains up in the Katmai facility.

117. Management determined that the Katmai facility was to be a facility for infants and toddlers, which guaranteed that the center would lose money. Ms. Lewis made recommendations on how to balance the centers so her center could at least break even. Despite ignoring Ms. Lewis' suggestions, and implementing a program that by

design would lose money, Ms. Fallon and Mr. Bartz and Ms. DeShasier put pressure
on Ms. Lewis to explain the losses suffered by the Katmai Center.

118.  During October of 2004 Ms. Lewis spoke with the Pattersons, parents of one of the
children at Katmai.  The Pattersons stated that they would like to move their child to
the Denali Child Development Center.  While processing the request, they learned
that Mr. Patterson had lost his job.  Policy required both parents to be working or in
school.  The family requested a 30 day extension.  In the meantime, the clerk had
found a place at Denali.  But Denali decided not to take the child, so they were talking
about and making arrangements in the Sitka Center.  Ms. Lewis, under pressure from
management to keep her open rooms filled, gave the Patterson child's slot to another
family on the waiting list for a newborn that was due in February, 2005.

119. The Patterson child went to the Sitka Center and never went without day care.

120. On or about October 6, 2004, Ms. Lewis was out on personal leave.  A child left the
Katmai Center without anybody seeing her do so.  Since Susan Fallon was the person
responsible for the Katmai Center when Ms. Lewis was out, Ms. Fallon conducted the
initial investigation into what happened, including talking with the caregivers, Teresa
Almazan and Lisa Taylor.

121. On or about October 12, 2004, Ms. Lewis came back from her leave.  Ms. Fallon
came over to the Katmai Center and met with Ms. Lewis.  They discussed the event
where the child had left the Katmai Center.  Ms. Fallon gave Ms. Lewis the Douglas
Factors sheet (guidelines for determining discipline) and instructed Ms. Lewis to
discipline the caregivers based on the Douglas Factors.  Ms. Lewis asked that since
Ms. Fallon was the supervisor during the incident, shouldn't she be the one to
discipline the caregivers?  Ms. Fallon said no, that Ms. Lewis should conduct the
discipline.  Ms. Lewis said OK.

122. On or about October 13, 2004, Ms. Lewis determined that retraining would be the
appropriate disciplinary action.

123. On or about October 18, 2004 Ms. Fallon called Ms. Lewis and asked about the

discipline given to Ms. Almazan and Ms. Taylor.  Ms. Lewis explained that after reviewing the Douglas Factors, reviewing information she received from the caregivers, reviewing videotapes from the rooms, and talking with Ms. Fallon about the reactions that the caregivers had at the time of the incident, that Ms. Lewis had decided to have the caregivers retrained.  Ms. Fallon was very upset with this choice and began yelling at Ms. Lewis.  Ms. Fallon told Ms. Lewis not to do anything else with respect to discipline.

124. On or about November 1, 2004, Ms. Lewis submitted a written request to Susan Fallon to take vacation from December 19, 2004 to January 6, 2005.   The request was made to spend the holiday with her daughter, as well as be there for her daughter's birthday.

125. On or about December 1, 2004, Ms. Lewis had not heard back from Ms. Fallon regarding her vacation request.  Ms. Fallon said she could not approve leave because she did not have coverage for Ms. Lewis.

126. Ms. Lewis went up to Col. Aupperle to discuss Ms. Fallon refusing her vacation request.

127. On or about December 2, 2004, EEO counselor Schroder dropped by Ms. Fallon's office and asked her a few questions about Ms. Lewis' claims.  He also asked to do a follow-up interview with Ms. Fallon.

128. Following the meeting with Mr. Schroder, Ms. Fallon called Ms. Lewis up to her office to discuss the budget.  But when Ms. Lewis arrived, instead of discussing the budget Ms. Fallon told Ms. Lewis she was writing her up for the October 6 incident.  Lewis asked, "That happened in October, why are you writing me up now?"  Ms. Fallon stated that she wanted Ms. Lewis to get back to her on the discipline given to Ms. Almazan and Ms. Taylor and discuss it with her.  But Ms. Fallon had never told Ms. Lewis that this is what she wanted her to do.

129. During the same meeting, Ms. Fallon also accused Ms. Lewis of leaving the staff meeting 15 minutes early without approval.  Ms. Fallon had approved the time on the

leave slip.  Ms. Lewis had her parent teacher conference to attend, and had scheduled the parent teacher conference to not coincide with the meeting, and had asked for time off with a leave slip to make sure she was at the parent teacher conference on time. The managers had changed the time of the meeting from the morning to the afternoon. Ms. Fallon wrote up both incidents on Ms. Lewis' employment record, form 971.

130. On or about December 11, 2004, Ms. Fallon met with EEO Investigator John Schroder.  Following that meeting, Ms. Fallon came to Ms. Lewis' office and informed Ms. Lewis that she was also going to write Ms. Lewis up for offering the Patterson child's spot to another family.  Ms. Lewis explained that the Patterson child was never displaced, and never would have been displaced, since the new child was not due until February 2005, at which time the Patterson child would have aged out of the room anyway.

131. On or about January 10, 2005, Ms. Lewis asked Ms. Fallon for a copy of the policies Ms. Lewis had been accused of violating.

132. On or about January 11, 2005, Ms. Fallon responded to Ms. Lewis' request for the policies and admitted there were no policies.

133. On or about December 13, 2004, Ms. Lewis' vacation leave request submitted on November 1, 2004 was approved.  However, by then it was too late to obtain tickets for holiday travel.  So Ms. Lewis had to postpone her vacation.  She missed her daughter's birthday.

134. On or about February 4, 2005, Susan Fallon followed through with her threat and issued a written reprimand for the Patterson issue that happened in October of 2004. The disciplinary action was noted in Ms. Lewis' employment file on her 971.

135. On or about February 18, 2005, Ms. Walker informed Ms. Lewis that Susan Speroff was talking with caregivers and spreading rumors that they would not have enough baby formula for the new infants arriving the following week.  Ms. Lewis reassured Ms. Walker that the infant formula had been ordered and she would let Ms. Speroff know.

136. Ms. Lewis walked into the faculty lounge and said to Ms. Speroff that when she had a chance, Ms. Lewis would like to speak with her in the office. Ms. Speroff came into Ms. Lewis' office. Ms. Lewis told Ms. Speroff that she is aware of the new arrivals for next week and the formula needs and that it would be taken care of. Ms. Lewis explained that even if the child arrived and the formula had not, they would get it either at the commissary or borrowed from one of the other centers. So she need not worry, it was taken care of, and Ms. Lewis had explained this to the caregivers and they knew that Ms. Lewis knew about the issue and that it was being taken care of. The formula was delivered on time and the center has not been out of formula. Additionally, the new arrivals were on breast milk, not infant formula. This must be provided by the mothers.

137. On or about March 15, 2005, Ms. Fallon sent a notice stating that there would be a marketing meeting the next day and that everyone was expected to attend. Ms. Lewis had a new clerk who did not know that there was a meeting already scheduled at the times she scheduled job applicant interviews.

138. On or about March 16, 2005, Ms. Lewis missed the marketing meeting because she was conducting job applicant interviews. Ms. Lewis caught up with Ms. Fallon after the meeting and explained what happened. Ms. Fallon was upset. Ms. Fallon explained that this was a mandatory commander's meeting, and when one of these meetings happens, Ms. Lewis had to reschedule whatever else was going on and make the meeting.

139. The commander had not even come to his last two marketing meetings. The commander did not come to this meeting either. Ms. Fallon did not give any information about any important matters that were raised at the meeting. Other people did not show up to this meeting either. None of the others who missed the meeting received reprimands for missing the meeting. They do not even keep rosters noting who attends the meetings.

140. On or about April 19, 2005, Ms. Fallon asked Ms. Speroff to gather information to

respond to the EEO investigation.  Ms. Speroff talked to Ms. Lewis about it.  Ms. Speroff told Ms. Lewis that she did not understand why she was supposed to be helping Chelley Correa with the investigation.  Ms. Speroff was venting her frustration with having to do extra work in helping Ms. Correa.  Ms. Lewis told Ms. Speroff if she felt like that then she should let Ms. Fallon and Ms. Correa know how she felt.

141. At some point following, and believed to be after April 19, 2005, Ms. Speroff submitted false written statements to Ms. Fallon regarding incidents of February 18 and April 19, 2005.

142. On or about June 16, 2005, Ms. Lewis received her 2005 evaluation.  She received very low scores.  Again, no award and no raise were given.  Ms. Fallon did not discuss the scores or the standards with ms. Lewis.  Nobody proposed a performance improvement plan for Ms. Lewis.  For some reason the line approving an award had been signed.

143. On or about July 6, 2005, Ms. Lewis began seeking treatment from Hugh Fisher, LMFT, at Good Samaritan Counseling Center to help cope with the stress and anxiety she was receiving from her superiors at work.

144. On or about July 12, 2005, Ms. Lewis requested a meeting to discuss the evaluation.  Col. Douglas had invited his deputy and Dianne Harrison to the meeting.   Ms. Lewis asked Ms. Harrison to explain the rating criteria and how it works.  Ms. Harrison explained the rater's job, the reviewers' job and if there is an award it goes up to Col. Douglas.  Ms. Harrison also explained the midyear feedback.  Ms. Fallon only gave the rating, but never gave the feedback.  Ms. Lewis asked how she was supposed to improve from midyear since nobody was telling her what they expected of her about improvements from midyear.  She did not receive an answer.  Ms. Lewis inquired about the signature for the award.  Col. Douglas said it happened, and it just happens sometimes, and it had happened to a lot of them.  Ms. Lewis asked about why he signed off on that rating.  He avoided and declined to answer the question.

145. Ms. Lewis' evaluation failed to recognize Ms. Lewis' successfully running the Part Day Preschool Program.

146. About an hour after meeting with Col. Douglas, Ms. Fallon called Ms. Lewis and told her that she needs to have a meeting regarding suspension. This is the first time that Ms. Lewis heard anything about a suspension.

147. On or about July 14, 2005, Ms. Fallon gave Ms. Lewis a "Notice of Proposed Suspension."

148. The notice contained statements that were false and misleading, and used those statements as a basis of justification for suspending Ms. Lewis.

149. On or about August 30, 2005, Kathy DeShasier, called Ms. Lewis into her office. Ms. DeShasier handed Ms. Lewis a copy of the suspension letter. Suspension began on August 31, 2005 and continued through September 14, 2005. The suspension was without pay. Ms. Lewis had requested a hearing and asked about a hearing. Ms. DeShasier said she spoke with legal and personnel and that she did not need to give Ms. Lewis a hearing. Ms. Lewis went back to her office and collected her things. Ms. Lewis went to see her therapist. She spent most of the night awake and in tears.

150. On or about August 31, 2005, Ms. Lewis called Nancy Veasey. Nancy Veasey told Ms. Lewis that Susan Long said Susan Speroff told her that Ms. Lewis had been suspended. Ms. Lewis had not told anybody, in fact she had just found out herself. Already the information is flowing through the office.

151. On or about September 14, 2005, Ms. Lewis reported back for work. All of the work that had come through for the two weeks of suspension had piled up on Ms. Lewis' desk, as Ms. Fallon had not done any of it. So Ms. Lewis was again overwhelmed with work, and expected to do the two weeks of work that she was not paid to do.

152. That same day Ms. Fallon contacted Ms. Lewis and told Ms. Lewis that she wanted her to come for a meeting, because Ms. Fallon was going to write up Ms. Lewis for Gena Walker missing a marketing meeting on August 17, 2005. Ms. Lewis had made

a list of meetings for Gena Walker and told Ms. Walker that there would be more meetings and that either Ms. Fallon or Fennis Baker-Waters would let her know about the other meetings.  Ms. Lewis told Ms. Fallon about the list.  Ms. Fallon had called Ms. Walker about the meetings, but neglected to email or call her about this particular marketing meeting.  Ms. Walker did not know about the meeting.

153. Ms. Fallon wanted to meet with Ms. Lewis right away.  Ms. Lewis said, "No, this is harassment" and she wanted to talk to people in the chain of command.

154. Ms. Lewis was on approved leave at the time Ms. Walker missed the meeting.

155. Ms. Lewis went to see Kathie DeShasier.  Ms. DeShasier seemed to know what Ms. Fallon was doing and she approved it.

156. Ms. Lewis went to Ms. Fallon and asked to see the write up but Ms. Fallon would not give it to her.  Ms. Lewis went to see Mr. Kobussen and Col. Lewis.  They were both out.  Ms. Lewis then went to the EEO office.  Mr. Kobussen called back later that afternoon and told Ms. Lewis that they had changed the rules and only Susan Fallon needed to come to the marketing meetings, not the CDC directors.  Ms. Lewis told Mr. Kobussen that Ms. Fallon had written her up for Gena Walker missing the meeting.  Mr. Kobussen said that was not going to happen.  Ms. Lewis was so stressed out that she had to go see her therapist.

157. Ms. Walker sent an email to Ms. Fallon asking if she, too, was going to be written up for missing the meeting.  Ms. Fallon emailed her back and said "No."

158. On or about September 15, 2005, Ms. Lewis returned to work.  She was still under a great deal of pressure trying to get caught up from all the work that had piled up during her suspension.  It seemed like an impossible task and Ms. Lewis' stress level became unmanageable again.  Ms. Lewis returned to Dr. Trombley's office and met with Physician's Assistant Wood.  Ms. Lewis had a severe headache, eyelid twitching and right ear pain.  Ms. Lewis talked about the stress she was experiencing at work.  Physician's Assistant Wood gave Ms. Lewis a shot of Toradol to take care of the headache.  Fioricet was prescribed for headaches.  Physician's Assistant Wood also

gave Ms. Lewis a note for two days off from work.

159. On or about August 22, 2005, Ms. Fallon gave sworn testimony to the EEO investigator.  In her testimony regarding finding coverage for Ms. Lewis when Ms. Lewis requests leave Ms. Fallon stated "he [Al Anderson - employee management relations] had me come over and he sat down and said, you know, she's coming to you as a program manager, she doesn't have an assistant so it's really not up to her to go to her collegues and say, can you cover for me, can you cover for me, it would really be your job."

160. On or about September 19, 2005, Ms. Lewis received a letter from Col. Lewis stating that instead of going up the chain of command, Ms. Lewis should just deal with the EEO office.  The chain of command approach is specifically listed in the discrimination packet on page 12.  Col. Snodgras specifically requires supervisors to respond promptly and fairly to allegations and ensure complainants are free from reprisal.  General Hestler also stated an expectation that commanders and supervisors enforce the EEO policy.

161. Shena Jones, the Caucasian marketing manager for the family services programs, missed her own mandatory marketing meeting.  Her only excuse for missing the meeting was that she was "in a cloud."  No disciplinary action was taken against Ms. Jones.

162. On or about November 16, 2005, Ms. Fallon had a meeting with Ms. Lewis to go over the midyear review.  During the conversation, Ms. Lewis asked Ms. Fallon why she relied on the word of one Caucasian person in deciding to discipline/suspend her.  Ms. Fallon indicated there was information from another person.  Ms. Lewis asked who?  Ms. Fallon said Chelley Correa.  Ms. Fallon did not and has never produced a statement from Chelley Correa.

163. Ms. Fallon marked Ms. Lewis down on element two on her midyear review, claiming that Ms. Lewis demonstrated insolence in her objections to signing Theresa Almazan's (a Katmai employee) revised performance appraisal.  Ms. Lewis had

questioned Ms. Fallon's rewriting of Theresa Almazan's performance appraisal and sought guidance from both the personnel and legal departments before signing the appraisal.

164. Ms. Lewis was also marked down on cooperation and responsiveness over Ms. Speroff's allegations of mishandling the baby formula incident even though the claim is not true and Ms. Lewis provided statements from others.

165. Under communication Ms. Lewis was marked down again for disrespectful comments in front of subordinates. When Ms. Lewis asked her about this, Ms. Fallon said comments were made in front of Brian Seagroves. Ms. Lewis disputed this and asked then why doesn't she have a statement from Mr. Seagroves. Ms. Fallon stated she did not have one, and the suspension is history. Ms. Lewis asked why then was it being used as justification for marking her down on her evaluation?

166. Under duty of performance, Ms. Fallon used the lack of formula as the reason to mark her down. Ms. Lewis again pointed out she was taking one Caucasian person's word, but ignored the written statements of several other people showing the Katmai Center was never out of formula. Ms. Fallon responded, "Everything was in motion then."

167. Under thoroughness Ms. Lewis was marked down for elevating up the chain of command the issue of the lack of working toilets in the adult bathrooms of Katmai. Management thwarted all of Ms. Lewis' attempts to get a working toilet in the adult bathrooms until one of the Katmai employees filed a union grievance.

168. On or about November 17, 2005, Ms. Lewis emailed Ms. Correa a question about the accusations that Ms. Correa had made to Ms. Fallon about Ms. Lewis.

169. On or about November 18, 2005, Ms. Correa emailed Ms. Lewis back stating that Ms. Speroff had declined to help with the investigation because Ms. Lewis had kept Ms. Speroff at the Katmai Center.

170. Ms. Lewis had not kept Ms. Speroff at the Katmai center. Ms. Speroff and Ms. Correa made false accusations about Ms. Lewis.

171. On or about November 18, 2005, the Katmai Child Development Center's photocopier broke down. Ms. Lewis paid $600 for repairs to photocopier with her Government Purchase Card ("GPC"). She logged the expenditure on the required GPC log.

172. On or about November 25, 2005, accounting employee Paul Borghols emailed Ms. Lewis asking her why there was a $600 charge for copy paper on her log. He also sent a copy of his email to Ms. DeShasier. Ms. Fallon called Ms. Lewis demanding an explanation for why there was a $600 charge for copier paper. Ms. Lewis explained that the charge was for copier repair, and invited Ms. Fallon to check the GPC log.

173. Later that day when Ms. Lewis was at the main office, Ms. DeShasier again confronted Ms. Lewis about buying copy paper. She spoke in a belittling tone to Ms. Lewis, and did not allow Ms. Lewis to get a word in to correct her. Ms. Veasey, Ms. DeShasier's secretary, called into the office reminding Ms. DeShasier that the purchase was for a copier repair, and that she had already told Ms. DeShasier that earlier that day. Ms. Lewis was then permitted to explain that the charge was for copier repair, and that it showed this on the GPC log. Ms. DeShasier looked at the GPC log and said, "Oh, OK." Nobody apologized to Ms. Lewis.

174. On or about January 18, 2006, Marketing Manager Shena Jones held a marketing meeting. Only three people attended the "mandatory" meeting. No disciplinary action was taken against employees that did not attend the meeting.

175. On or about February 9, 2006, Ms. Lewis requested leave for February 10 and February 14. The reason she stated for taking leave was "EEO case." Lisa Dalton, the Caucasian training and curriculum specialist for the Katmai Center, also took leave that day.

176. On or about February 10, 2006, Ms. Fallon denied Ms. Lewis' leave request. Ms. Lewis discussed the reason for the denial with Ms. Lewis. Ms. Fallon stated that Tim Renegar, the inspector, might come back to her center. Ms. Lewis explained to Ms.

Fallon that Tim Renegar had told Ms. Lewis that he was finished with his inspection of the Katmai Center.  Ms. Fallon still would not allow Ms. Lewis to take leave.

177. Ms. Fallon was authorized to take sick leave on February 10, 2006 by Kathie DeShasier.  Ms. Fallon gave no reason for the request.

178. Both Ms. Fallon and Ms. DeShasier did not attend the out-briefing for the inspection even though they were supposed to be there.

179. On or about February 28, 2006, Ms. Lewis requested official time to be able to work on her EEO case.  Ms. Fallon asked Ms. Lewis to identify who would be covering for her as Supervisor on Duty.  Ms. Fallon did this despite the fact that she knew she was responsible for finding coverage for Ms. Lewis.

180. On or about March 7, 2006, the Civilian Personnel office issued a memorandum stating that mid-term reviews now have to be reviewed by the Quality Review Officials.  It also states that supervisors have to go over core docs (employee job descriptions) during the annual review for the next review period with their employees.  Ms. Fallon never complied with this policy when giving Ms. Lewis her mid-term reviews or annual evaluations.

181. On or about March 7, 2006, two Caucasian caregivers, Danielle Peterson and Tabitha Seeseldt were found to have been posting confidential information about the Katmai Center on myspace.com, including information about the children and caregivers.  When Ms. Lewis was informed by an employee about this, Ms. Lewis took the myspace.com printouts to Ms. Fallon and Charlene Marks in the Human Resources Office.  No disciplinary action was taken against these two employees.

182. Shena Jones missed her own mandatory marketing meeting, again.  She was not disciplined for this, either.

183. On or about March 16, 2006, the Katmai staff had gone so long without an operating bathroom for the adults that employee Veronica Van Buren made a complaint to the union about lack of operating bathrooms for employees of Katmai.  Ms. Lewis had previously been suspended in part due to taking this issue up the chain of command to

Mr. Kobussen.

184. On or about March 16, 2006, Ms. Lewis took her printer to Lewis & Lewis Computers to find out why it was not working. She learned that there was nothing wrong with the printer, so it had to be a problem with either the software in her computer or the electrical system in the Katmai Center.

185. On or about March 21, 2006, Ms. Lewis was instructed by Ms. Fallon to not take any disciplinary action against the two Caucasian employees who had posted information about the employees and children at Katmai, but only to talk to the ladies and document their file.

186. On or about March 28, 2006, Ms. Lewis requested leave. Ms. Fallon informed Ms. Lewis that she would not sign the leave slip unless Ms. Lewis found somebody to cover for her. Ms. Lewis expressed the fact that it was unfair that the other directors do not have to find people to cover for them, that they have assistant directors and she has to use people in the classroom as the coverage person, who are not able to do managerial work. Nobody does the management work while she is gone and it just piles up. Ms. Lewis spoke with Ms. DeShasier about the leave request and the problem, and Ms. DeShasier took the same approach as Ms. Fallon, making Ms. Lewis find her own coverage.

187. Col. Lewis sent a kudos email to all 3rd Wing personnel, which included Ms. Lewis, for their performance in the Operational Readiness Exercise Phase II.

188. On or about April 26, 2006, Ms. Lewis received a copy of a memorandum the Air Force issued stating that the Child Development Centers had lost over $128,000 in the fourth quarter of 2005. The email sent by Ms. DeShasier recommended that the Child Development Centers "Need to tighten our belts . . . ." The email that accompanied this memorandum indicates it was sent to Peggy Buchanon, Caucasian director of the Sitka Child Development Center.

189. On or about May 15, 2006, Ms. Buchanon spent $300 for plants and plant supplies to beautify the Sitka Center. Some of this money was spent before approval. Ms.

Buchanon was not disciplined for this expenditure.

190. On or about May 19, 2006, Ms. Fallon called Ms. Lewis into her office and gave Ms. Lewis her annual review. The ratings were again extremely low, but Ms. Fallon stated that Ms. Lewis had shown improvement. Ms. Fallon gave no specifics regarding areas Ms. Lewis had improved, or could improve. Again, no award was given. Ms. Fallon did not put Ms. Lewis on a performance improvement plan. Ms. Fallon asked Ms. Lewis to sign the signature page of her Core Doc. She only showed Ms. Lewis the signature page. Ms. Lewis asked to review her entire Core Doc so she could review her job description. Ms. Fallon did not have the rest of the pages of Ms. Lewis' Core Doc, so Ms. Lewis declined to sign.

191. On or about June 1, 2006, Ms. Lewis received a PACAF bear award because the Katmai center was going to be the first center to go through the new NAEYC accreditation and they had met all of the requirements at that point.

192. On or about June 12, 2006, Ms. Fallon and Ms. DeShasier called Ms. Lewis and Ms. Correa in for a meeting to discuss purchasing NAEYC materials for the Katmai Center. When Ms. Fallon and Ms. DeShasier arrived at the meeting, they wanted a report about the NAEYC training Ms. Lewis just attended. They put Ms. Lewis on the spot for discussing something different than what she was told to be ready to discuss. Ms. DeShasier wanted to know where the copies of the orders for the Katmai NAEYC accreditation materials. Ms. Lewis said she had given those to Ms. Correa. Ms. Correa denied knowledge of the orders. Ms. Lewis went and got a copy she had made of the orders provided it to the others at the meeting.

193. On or about June 16, 2006, Ms. Lewis went to another meeting with Ms. DeShasier, Ms. Fallon and Chelley Correa. When Ms. Lewis arrived, Ms. DeShasier, Ms. Fallon and Ms. Correa were already there. Ms. DeShasier made the comment that Ms. Lewis was not being a team player and it was time for all this to stop. Ms. Lewis asked what to stop? Ms. DeShasier said Ms. Lewis needed to stop taking things personally. Ms. Lewis asked whether the three of them had gotten together and discussed Ms. Lewis

previous to her arrival and she thought this meeting was to discuss the NAEYC accreditation.  Ms. Lewis stated that if they were there to discuss NAEYC, OK, but if they wanted to discuss Ms. Lewis then she felt that since there were three Caucasians there to criticize her, that she felt uncomfortable and she needed to leave.  They then changed the subject and began talking about NAEYC accreditation.

194. On or about June 16, 2006, Ms. Lewis sent an email to Ms. Fallon asking for approval to spend $300 toward flowers and hanging baskets for Katmai.  Ms. Fallon denied the request.

195. On or about June 30, 2006, Ms. Lewis received the Multidisciplinary inspection report.  Ms. Lewis noticed that there was yet another under-qualified Caucasian person hired into the Sitka Center, Karen Waples.  Ms. Lewis asked Ms. Fallon via email why Katmai does not have an assistant director.  It appeared to her that the rules were clearly being bent for the benefit of the Caucasian employees at Sitka, but when it came to herself and Gena Walker (African-American), they manipulated Gena Walker to do the work of an assistant director when Susan Fallon was acting director of Katmai (previous to hiring Ms. Lewis) without having to promote her to that official capacity, meaning that Ms. Walker was still getting underpaid and underreported in her work history.  But once Ms. Lewis had filed her EEO complaint, Ms. Fallon, Mr. Bartz and Ms. DeShasier began to deny that Ms. Walker could help Ms. Lewis with administrative duties.  They informed Ms. Lewis that since Ms. Walker is only a GS-7, Ms. Walker cannot help hire new employees, she cannot sign off on timecards, she cannot do the reports that come in, she cannot do correspondence, she cannot discipline employees, she cannot complete 332s despite the fact that Ms. Walker used to do all of these things when Ms. Fallon was the director of the Katmai Center.

196. On or about June 30, 2006, Ms. Fallon responded to Ms. Lewis' inquiry via email.  Ms. Fallon explained that Denali and Katmai are pooled together now so Katmai is an annex of Denali.  This is the first time Ms. Lewis ever heard that Katmai was

considered an annex to Denali.  The information goes on to state, "using the Manpower Table for 22 positions, it indicates a flight chief, a director, ..."  But there are two directors, Ms. Baker-Waters and Ms. Lewis.  So the Child Development Centers were in violation of Manpower usage regulations.  They could have put Ms. Lewis as the Sitka Center director since she was already a GS-11 and moved Ms. Barkley, who was a GS-9, into running Katmai and this would have left only one director - Ms. Baker-Waters.  If the Air Force had not discriminated against Ms. Lewis and had followed Ms. Lewis' recommendation that she be kept as the Sitka Center director, the Air Force would not have been in violation of the regulations.

197. On or about June 30, 2006, Ms. Lewis responded to the email response she received from Ms. Fallon.  Ms. Lewis questioned Ms. Fallon about the treatment of Ms. Waples as being hired for the trainer position even though she was not qualified when there were a number of people, many of whom are African-American (Ms. Walker, Ms. Van Buren, Ms. Ginn-Williams and possibly others) who have the same qualifications as Ms. Waples and were not told that the position qualification requirements would be lowered.

198. On or about July 5, 2006, Ms. DeShasier responded to Ms. Lewis' inquiry to Ms. Fallon dated June 30, 3006.  Ms. DeShasier discouraged Ms. Lewis from asking the questions or pursuing the issue.  Ms. DeShasier clearly did not want Ms. Lewis to inform the Air Force about what Mr. Bartz, Ms. Fallon and Ms. DeShasier were doing because they would have to give "some of their positions back."

199. On or about July 7, 2006, one of Ms. Lewis' leave requests was denied.  The reason given was that there was "Not sufficient coverage for the absence."

200. Ms. Lewis was authorized for leave from July 14, 2006 to August 4, 2006.  On or about July 13, 2006, in preparation to take her leave, Ms. Lewis briefed Ms. Fallon on the work orders (332 forms) that needed to be completed and hiring of staff that needed to be done while she was gone.  Ms. Fallon responded, "You don't want me to do that, do you?" in a how-dare-you-ask-me-to-do-this tone of voice.

201. On or about July 29, 2006, a concerned parent wrote to the Air Force's newspaper, Sourdough, stating that although she is pleased with the care given at Katmai, she is concerned about the living environment in the center - specifically the heat and the fact that her son suffered from heat rash. This problem does not occur in other centers because they have proper working ventilation. There was no ventilation in the Katmai Center.

202. On or about August 7, 2006, Ms. Lewis returned to work. Ms. Lewis spoke with Ms. Correa. Ms. Correa informed Ms. Lewis that she had hired new employees for the Katmai Center, and had given the completed paperwork to Ms. Fallon. Ms. Correa explained that the printer was not working again. She also stated that she had been told by Ms. Fallon to discipline a caregiver, Cindy Ferguson, but she had refused to do that. Ms. Correa was not written up for insubordination.

203. Ms. Lewis entered her office and found that the work for the center had just been piled on her desk and nobody had covered the director duties while she was gone. There were suspenses that needed to be completed. There were vacancies in the program and hiring needing to be done. Several employees were leaving and nobody had done anything towards hiring their replacements. There were classroom slots to be filled. There were material and food shortages due to nobody paying for the food and materials after Ms. Lewis had made the orders and then left. Her equipment was broken down (copier and printer). Ms. Lewis went to work trying to get caught up but Ms. DeShasier and Ms. Fallon would not allow Ms. Lewis to work overtime or use compensatory time to get caught up. They still had not provided her with a printer and required her to either bring a disk to the main office or email everything needing to be printed to the main office for Nancy Veasey to print and either send interoffice mail or she would have to go and pick it up.

204. Ms. Lewis contacted Human Resources regarding the newly hired employees Ms. Correa had requested. Sarah informed Ms. Lewis that Ms. Correa had not turned in the paperwork. Ms. Lewis questioned this as her information indicated that Ms.

Correa turned in the paperwork first.  Sarah said no, the Sitka Center had turned in paperwork first.  This left Ms. Lewis again short staffed and struggling to cover caregiver-to-child ratios in her rooms.

205. Ms. Lewis contacted Ms. Correa and asked her about submitting the paperwork. Ms. Correa stated she followed Ms. Fallon's procedures and completed all the paperwork and turned them in before the Sitka Center had selected them.  Ms. Correa became upset and called Ms. Fallon.  Ms. Fallon explained that Sitka had completed the hiring process first.  Ms. Correa knew for a fact that the Sitka Center employees had not completed the reference checks.  Ms. Fallon finally checked into the facts and found that Sitka employees had not checked the references.  By arguing her case with Ms. Fallon, Ms. Correa was able to get the employees assigned back over to the Katmai Center.

206. Ms. Lewis felt like an outsider and an outcast, blackballed and disrespected.  She had the choice of working like a slave, losing her job because she was not keeping up, or both.  She began to experience panic attacks as a result of feeling like she is being set up to fail because she could not get caught up with the workload they were placing on her.  She experienced sleepless nights and crying spells.  She felt like she was getting no support from uncooperative trainers that were assigned to her program - Chelley Correa and Lisa Dalton. Every day driving into work she had no idea what her supervisors were going to hit her with and wondered how she would make it through the day.

207. On or about August 10, 2006, Ms. Lewis submitted her paperwork to hire replacements for the employees that had left or were in the process of leaving when she was on leave.  The Sitka Center employees also submitted paperwork to hire these new employees, but had done so after Ms. Lewis had turned in her paperwork.  Ms. Fallon decided to give the newly hired employees to the Sitka Center even though she knew Ms. Lewis had submitted her paperwork first.  Ms. Fallon justified this action by stating that since Ms. Lewis obtained the last group of new hires, those that

Chelley Correa had hired, she would give this group to the Sitka Center. The first-to-submit policy was abandoned in order to favor the Caucasian run Sitka Center.

208. Ms. Lewis' panic attacks became worse. She was struggling with how unfairly she was being treated and how to communicate that to management but not give them further fuel to use against her by claiming that she was insubordinate. So she was struggling to control her emotions and hold everything inside her despite the fact that it was clear to her that they were overworking her and sabotaging her efforts in any way they could. Ms. Lewis recognized that she had the weight of management against her.

209. Ms. Lewis continued to see her therapist at the Good Samaritan Counseling Center. On or about August 15, 2006, Mr. Fisher referred Ms. Lewis to Dr. Hendelman for depression.

210. On or about August 25, 2006, an article appeared in the Air Force's newspaper, Sourdough, from a parent complaining that she did not want her child moved from the Katmai Center to one of the other Child Development Centers. The parent stated that even though Katmai is the oldest and smallest Child Development Center, she considers herself lucky to leave her son in such capable hands. She was upset that her child could not continue at the Katmai Center because she really liked the service there.

211. On or about August 28, 2006, Ms. Ginn-Williams (African American) and Veronica Van Buren (African-American) were at the front desk of the Katmai Center, along with Beverly Ritz (Caucasian), a temporary worker loaned from the Sitka Center. Ms. DeShasier came into the center with Cathy Caitling, a V.I.P. (the Child/Youth Specialist) from PACAF headquarters. Ms. DeShasier introduced Ms. Caitling to Beverly Ritz, but did not introduce her to Ms. Van Buren or Ms. Ginn-Williams. Ms. DeShasier gave Ms. Ritz a bag of M&Ms and Dr. Pepper right in front of the other ladies and thanked her for helping at the Katmai Center and mentioned that she had to bribe her to come over to Katmai.

212. On or about August 30, 2006, Ms. Ginn-Williams decided to confront Ms. DeShasier about the August 28, 2006 incident. She pointed out a number of incidents about how Ms. DeShasier disrespected her, and how the special treatment she showed Ms. Ritz.

213. On or about September 2, 2006, Ms. Lewis received another Bear Award from Cathy Caitling from PACAF. This award was for doing a good job preparing the Katmai staff for the NAEYC accreditation.

214. On or about September 4, 2006, Chelley Correa began three weeks of leave. Ms. Correa was the lead training and curriculum specialist and was a key member on the team to get the Katmai Center through the NAEYC accreditation process. Chelley Correa's leave was approved by Kathie DeShasier knowing that the Headquarters inspection was going to be taking place during this time and that Julia Butler from Caliber (an NAEYC accreditation consultant) was going to be there. Julia Butler was very specific in telling Ms. DeShasier that the whole team needed to be there to meet with her and prepare for the NAEYC accreditation.

215. On or about September 5, 2006, Ms. Ms. Fallon brought Ms. Lewis her Civilian Progress Review Worksheet. The evaluation was again low and contained inaccurate and unfair statements. Ms Lewis read it. Ms. Fallon did not say anything about it except that Ms. Lewis was to sign it. Ms Lewis declined. Ms. Lewis questioned Ms. Fallon about each of the evaluation points and showed how the evaluation was not fair.

216. On or about September 7, 2006, Ms. Caitling sent an email to Ms. Lewis commending her on an "excellent" job regarding the NAEYC accreditation process.

217. On or about September 8, 2006, Ms. Lewis was up in the main office. Susan Fallon asked Ms. Lewis about Julia Butler's arrival on Monday, September 11, 2006, what was her plan with respect to Ms. Butler on Monday. Ms. Lewis reminded Ms. Fallon that she does not work on Monday, that Monday was her flex day and she had scheduled appointments for that day. Ms. Fallon said, "Well, I will have to talk with

Kathie about this."  Ms. Lewis said "OK" and she left the main office.

218. On or about September 12, 2006, Ms. DeShasier gave Ms. Lewis a memorandum canceling Ms. Lewis' flex schedule.  Ms. Lewis asked if Ms. DeShasier was doing the same for Chelley Correa since Ms. Correa has a similar schedule.  Ms. DeShasier said no, since Ms. Correa was not a director.

219. On or about September 13, 2006, Ms. Lewis met with the new commander, Col. Michael Borgert.  Ms. Lewis told him that Ms. DeShasier was canceling her flex schedule.  Ms. Lewis explained how management was harassing her and treating her differently than the Caucasian employees.  Col. Borgert listened and took notes on the issues Ms. Lewis presented.  Col. Borgert told Ms. Lewis he would check into the issues and get back with her.  He did not get back with Ms. Lewis.

220. On or about September 20, 2006, Kathie DeShasier and Susan Fallon held a meeting with Denali Center Director Fennis Baker-Waters, and Sitka Center Director Peggy Buchanan, to discuss moving caregivers into the Katmai Child Development Center. Ms. DeShasier and Ms. Fallon did not include Ms. Lewis in the meeting.

221. Ms. DeShasier and Ms. Fallon came to the Katmai Child Development Center at 4:30 p.m. to inform Ms. Lewis that they had met with the other directors and decided to bring caregivers to Katmai to learn the NAEYC accreditation and to have them there to cover the rooms at Katmai.  Ms. Fallon and Ms. DeShasier both told Ms. Lewis that the caregivers were coming on a temporary basis, and would return to the Sitka and Denali Centers in January 2007. Ms. Lewis informed Ms. DeShasier and Ms. Fallon at that time that she did not think that was a good idea.  Ms. Lewis stated that if they were meeting with other directors about Katmai, she should have been included because she could have addressed the pros and cons of having other caregivers come into the program. Ms. Lewis was in the process of hiring caregivers and for consistency and harmony in the program, Ms. Lewis recommended that they should focus on the hiring in of new staff. Ms. Lewis explained that the staff at the other centers do not get along and bringing them into the Katmai center with staff that

is already working the accreditation process will create a major problem.

222.  Ms. DeShasier and Ms. Fallon did not want to hear this. Ms. Lewis asked them if they had discussed any alternative plans.  Ms DeShasier said "no" and "Janet it is your responsibility to get this program accredited and pass the revisit inspection.  If you have something better let's hear it." Ms. Lewis explained to Ms. DeShasier that because they had just brought this to Ms. Lewis at the end of the day, Ms. Lewis did not have any plans at this time.  Ms. Lewis had just told them it would be better to allow her to complete the hiring process instead of sending her new hired staff over to the Sitka Center.

223. Ms. Lewis' program would have been fully staffed if Ms. Fallon and Ms. DeShasier had not taken the employees Ms. Lewis had hired in August and given them to the Sitka Center.  This was a problem of Ms. DeShasier's and Ms. Fallon's own making.

224. Ms. DeShasier stated that she needed an alternate plan by the next day or they would be going with the plan to move caregivers temporarily from Denali and Sitka Centers into Katmai. Ms. Lewis told Ms. Fallon and Ms. DeShasier that if this is the decision that they were making then that is what she have to go with.  The only information shared with Ms. Lewis about the caregivers coming over was that they were coming over to learn the new NAEYC accreditation and to be in ratio to fill the holes in the center.

225. On or about September 22, 2006, Ms. Fallon called Ms. Lewis to inform her that the Denali and Sitka caregivers would be coming over on Wednesday, September 27, 2006.  Ms. Lewis said "OK". Ms. Fallon made no mention of the fact that she planned to participate in the meeting.

226. On or about September 26, 2006, a meeting was scheduled for 2:00 p.m. to work on accreditation where Ms. Lewis was told to lead the meeting.  Ms. Fallon called that morning to change the time of the meeting to 11:00 a.m.  Ms. Lewis said she could not make that time due to coverage problems and being out of ratio if she left.  Ms. Fallon knew about the coverage problems because she had been covering the Katmai

Center the previous week while Ms. Lewis had been working with Julia Butler. Ms. Fallon knew that Ms. Lewis was not going to be able to attend the meeting because she short staffed the rooms and did not find coverage from the other centers while Ms. Lewis was out.

227. Ms. Fallon met with Lisa Dalton and Chelley Correa at 11:00 a.m. even though Ms. Lewis could not make the meeting. At all other times they had accreditation meetings, if Ms. Correa, Ms. Fallon, Ms. Dalton, or Ms. Butler could not make it, they would cancel the meeting and reschedule. Ms. Lewis pointed out that they had rescheduled for everybody else, so why not her? Ms. Lewis reminded them that the consultant had said the whole group should work as a team together on the project. Ms. Fallon's reply was Ms. Dalton cannot make it at 2:00 p.m. Ms. Lewis suggested rescheduling for the following day. Ms. Fallon decided they were not going to do that so she went ahead and met with Ms. Correa and Ms. Dalton.

228. Ms. Fallon and Ms. Correa came back at 2:00 p.m. to have a meeting, but Ms. Lewis thought they had their meeting that morning so she canceled the meeting on her calendar. Ms. Lewis was not able to take lunch due to coverage issues. She asked Ms. Fallon if she could leave early or take compensatory time since she had no time to take lunch that day. Ms. Fallon said no. When Ms. Lewis asked her why, Ms. Fallon said she would check. Ms. Fallon called back later and said Ms. Lewis should have managed her time better and she should have taken lunch.

229. On or about September 26, 2006, Ms. Butler issued her draft report on the NAEYC Accreditation stating that management level conflict and "the personnel issue" was impacting the quality of care at Katmai. She also noted there was a lack of clarity over who was on the accreditation team.

230. On or about September 27, 2006, Ms. Ms. Fallon came over to sit in on the welcoming of the employees transferred from Sitka and Denali to Katmai. Ms. Lewis asked whether Ms. Fallon met with Fennis Baker-Waters and Peggy Buchanon when they met with the caregivers to discuss the transition to Katmai. Ms. Fallon said she

had not. Ms. Lewis pointed out that this again looks like harassment and retaliation because Ms. Fallon has never come over when she welcomed any other caregivers.

231. Ms. Lewis felt like Ms. Fallon was there just to intimidate her. Ms. Lewis stated she needed to meet with the commander. Ms. Fallon said, "Go ahead, where would you like the staff to go?" Ms. Lewis said they could wait in the staff lounge until she returned.

232. Ms. Lewis met with Tony Kobussen. Ms. Lewis explained what was happening and that this is harassment and interference with Ms. Lewis doing her job and she was tired of this happening. Ms. Lewis confronted Mr. Kobussen in his role and stated he had done nothing to help the situation. Mr. Kobussen stated, "I know. I know." Mr. Kobussen said he would check into it and that this should have stopped by now. He told Ms. Lewis he would brief the commander (Col. Borgert) on the situation. Ms. Lewis did not hear back from Mr. Kobussen.

233. Ms. Lewis went back to Katmai and met with Ms. Fallon and the Caregivers. Ms. Lewis welcomed them and explained to the caregivers that they were at Katmai to learn the NAEYC accreditation and take it back to their centers. Ms. Fallon did not say that the caregivers were being reassigned. Ms. Lewis asked Ms. Fallon if she would like to add anything. Ms. Fallon gave a few words of welcome to the caregivers, too. Ms. Lewis and Ms. Fallon took the caregivers to the rooms that they were assigned to work. Ms. Lewis introduced them to the other caregivers that they would be working with, and left them in their assigned rooms. Ms. Lewis and Ms. Fallon walked back down the hall together. Ms. Fallon said, "Good job, Janet." Ms. Lewis said "Thanks" and went back into her office as Ms. Fallon left the building.

234. On or about September 28, 2006, Ms. Lewis requested two hours of leave to go to a conference regarding special needs children at one of her foster children's school. Ms. Lewis had two foster children who were both special needs children. Ms. DeShasier denied the leave claiming that Ms. Lewis refused to ensure coverage in the facility. Ms. DeShasier was aware that management was supposed to be finding

coverage for Ms. Lewis when she needed to take leave. Chelley Correa worked at Katmai that day and was available to cover for Ms. Lewis. Ms. DeShasier knew this. Since Ms. Correa is not Ms. Lewis employee, Ms. Lewis cannot have Ms. Correa cover for her. Ms. DeShasier is Ms. Correa's direct supervisor, so only Ms. DeShasier can have Ms. Correa cover for Ms. Lewis.

235. On or about October 1, 2006 Ms. Lewis completed the NAEYC Accreditation Application. She presented it to Ms. Fallon for review.

236. On or about October 3, 2006, Beverly Ritz (Caucasian) was allowed to submit her sick leave request following her absence. She was approved for 10 days of sick leave with only a doctor's brief note.

237. On or about October 10, 2006, Cathy Catling sent an email to Ms. Fallon, Ms. Lewis and others stating "Good work on the application form!"

238. On or about October 10, 2006, Ms. Lewis requested leave for October 12, 2006, so she could work on her EEO case.

239. On or about October 11, 2006, Susan Fallon denied Ms. Lewis' October 10 leave request.

240. On or about October 15, 2006, Ms. Fallon and Ms. DeShasier decided to move another one of the Sitka Center's problem employees, Ray Guylas, over into Ms. Lewis' program without asking Ms. Lewis. Even though Ms. Lewis had told Ms. Fallon and Ms. DeShasier that Mr. Guylas was a problem employee, they still made him work at the Katmai Center.

241. On or about October 17, 2006, Ms. Lewis requested sick leave for October 18, 2006 for four hours, and October 31, 2006, for two and a half hours. Ms. Fallon approved leave for October 18, but denied it for the October 31, based in a Caliber consultant for NAEYC accreditation visiting.

242. On or about October 26, 2006, Ms. Fallon came over to Katmai and spoke with Ms. Correa. Ms. Fallon then asked to meet with Ms. Lewis in her office. They went into Ms. Lewis' office. Ms. Fallon told Ms. Lewis she was taking disciplinary action

against Ms. Lewis for how she welcomed the caregivers on September 27th.  Ms.
Lewis said that was a month ago, and asked why Ms. Fallon waited until then.  Ms.
Lewis pointed out there were plenty of opportunities to address this over the previous
month, and asked why was it not addressed.   Ms. Fallon had no explanation.  Ms.
Fallon handed Ms. Lewis the Continuation Form 971 with her complaint.  Ms. Lewis
read it over and told Ms. Fallon that what she wrote was not true.

243. On or about October 31, 2006, Ms. Lewis walked to her office door and looked in
the window.  Ms. Lewis saw Ms. Fallon and Elda Noceda in her office.  Ms. Lewis
watched Ms. Noceda hand Ms. Fallon a piece of paper.  She saw Ms. Fallon review
the paper, and point to parts of it.  Then she saw Ms. Noceda write where Ms. Fallon
indicated.  It appeared to Ms. Lewis that Ms. Fallon was telling Ms. Noceda what to
write on the piece of paper.   When she tried to enter, Ms. Fallon came out and said
that she would be out in a few minutes.  When Ms. Fallon came out, Ms. Lewis asked
her whether there was anything she needed to know.  Ms. Fallon said "no."  Then Ms.
Fallon said that Virginia Murray and Miranda Phillips were having some problems.
Ms. Lewis asked if there was something she needed to know about Elda Noceda.  Ms.
Fallon said "You will know soon enough."

244. On or about November 1, 2006, Ms. Fallon called Ms. Norman into Ms. Lewis'
office before Ms. Lewis arrived for work (sometime before 8:00 a.m.).  Veronica Van
Buren reported to Ms. Lewis that Ms. Fallon brought Ms. Norman into Ms. Lewis'
office.  Ms. Van Buren saw Ms. Fallon telling Ms. Norman to write something on a
piece of paper.  Ms. Norman did in fact provide Ms. Fallon with a writing.  When Ms.
Lewis came to work, Ms. Van Buren informed Ms. Lewis that she saw Ms. Fallon in
her office with Ms. Norman writing something on a piece of paper and talking with
her about it.  Ms. Johnson also reported to Ms. Lewis that she saw Ms. Fallon and one
of the Sitka caregivers meeting together in the bathroom and Ms. Fallon was having
her write something.  Ms. Lewis asked Ms. Fallon to meet her in her office.  Ms.
Lewis asked Ms. Fallon about Ms. Norman and Ms. Noceda and whether Ms. Fallon

was having them write statements about Ms. Lewis. Ms. Fallon again said, "You'll know soon enough."

245. Ms. Lewis wanted to know why Ms. Fallon was asking the Sitka caregivers to write statements about her. Ms. Lewis told Ms. Fallon that Ms. Lewis was trying to work as a team on the NAEYC accreditation. Ms. Lewis explained to Ms. Fallon that meeting with employees, asking them to write statements against her does not help build teamwork. Ms. Lewis wanted to know why Ms. Fallon was doing this. Ms. Fallon stated that Ms. Lewis was supposed to "embrace" the transferred employees. Ms. Lewis asked, "Do you mean getting up and hugging them?" Ms. Lewis explained that she welcomed the Sitka caregivers the same way that she does with the other new staff. Ms. Lewis asked Ms. Fallon what else she expected Ms. Lewis to do. Ms. Fallon remained silent. Ms. Lewis stated she felt this was another example of Ms. Fallon working against her and trying to undermine her ability to create a team at Katmai. Ms. Lewis told Ms. Fallon she wanted to make a complaint with the EEO office. Ms. Fallon said Ms. Lewis had to make an appointment. This was strange because Ms. Lewis had previously never needed to make an appointment. Ms. Lewis called EEO office secretary Nina James. Ms. James said Ms. Lewis did not need an appointment, and invited her to come over. Ms. Lewis told Ms. Fallon that Ms. James said to come over. Ms. Fallon asked, "Do they have an appointment available?" Ms. Lewis explained that Ms. James said an appointment was not necessary.

246. After Ms. Lewis finished making her complaint with the EEO office, she went to Col. Borgert to ask for his help with the situation. Col. Borgert was not in. Ms. Lewis spoke with Tony Kobussen. Ms. Lewis explained everything to Mr. Kobussen about how Ms. Fallon was asking caregivers to write statements against Ms. Lewis and interfering with her doing her job. Ms. Lewis explained to him how Ms. Fallon did not meet with the Denali and Sitka directors when they talked with the caregivers about coming over to Katmai but she felt it necessary to meet with Ms. Lewis and the caregivers when they came to Katmai. Ms. Lewis explained to Mr. Kobussen that this

was intimidation and harassment.   Ms. Lewis told Mr. Kobussen that Ms. Fallon never did this with any other new staff Ms. Lewis had  welcomed into the center.  Mr. Kobussen gave his standard line, "I'll check into it and get back with you Janet."  Just like all the other times, he never got back with Ms. Lewis.

247. Ms. Lewis returned to the Katmai Center and asked Ms. Fallon for leave to go see her doctor because she was feeling so stressed.  Ms. Lewis filled out a leave slip and took it to the training room.  She gave the slip to Ms. Fallon.  Ms. Fallon said she would get on the phone and try to get the leave approved.  Ms. Lewis said she would go over to Ray Lammon at the EEO office and then come back to see if leave was approved.  Ms. Fallon said to go ahead and do that.  Ms. Lewis went to the team meeting with Ms. Correa, Ms. Butler (the Caliber Consultant for the NAEYC accreditation), and Ms. Dalton and told them she would not be able to stay.  Ms. Lewis said she had some legal issues to take care of and she had to go to the EEO office.   Ms. Correa and Ms. Dalton both wrote statements about this incident and both wrote that Ms. Lewis appeared upset that Ms. Fallon was having people write letters about Ms. Lewis.

248.  Ms. Lewis went to see her therapist, Hugh Fisher, at the Good Samaritan counseling center.

249. When Ms. Lewis returned to the Katmai Center she saw Katrina Norman.  Ms. Lewis asked Ms. Norman if Ms. Fallon asked her to write statements about Ms. Lewis.  Ms. Norman said she was caught in the middle, and she did not know what to do.  Ms. Lewis told her that was not a good thing for her to do.  Ms. Lewis told her it was something going on with upper management and staff should not have been included in it.  Ms. Lewis did not see Ms. Norman cry.  Later Ms. Van Buren reported to Ms. Lewis that she had received reports that both Ms. Norman and Ms. Noceda were crying in the faculty lounge.  They were telling the other staff in the lounge that they felt caught in the middle.  Ms. Norman wrote a letter indicating that she called Ms. Fallon and told her she did not want to be caught in the middle and she wanted to

go back to Sitka.  Ms. Fallon told her to write everything down.

250. Ms. Lewis went to see her doctor at Primary Care Associates.  They gave her a shot and some medication to calm her down.  The physician's assistant also gave her a note to take the rest of the week off.

251. On or about November 7-8, 2006, Ms. Lewis attended the NAEYC training with Chelley Correa and Kathy Caitling, PACAF child and youth specialist, at Dobbins Air Base in Georgia.  Ms. Correa brought up the incident involving the myspace.com posts by caregivers.  Ms. Caitling stated that there should have been more done in that Ms. Lewis should not have stopped at Ms. DeShasier and Ms. Fallon, but should have had somebody else look into it.  Ms. Caitling stated that the posts on myspace.com were completely inappropriate and a huge violation of the confidentiality of the children and caregivers, and that what Ms. Fallon and Ms. DeShasier did was not enough to address the issue.

252. On or about November 13, 2006,  Ms. Lewis told Katmai's food services employee, Miranda Phillips, to come into her office to discuss the fact that Ms. Phillips had been late again for work.  Ms. Phillips did not go to Ms. Lewis' office.  Instead, she went to work and at lunch she talked to caregivers Capricia Turner and Melanie Ginn-Williams in the break room about going on a killing spree.  Ms. Phillips was very specific about killing people at Katmai, then repenting and killing herself because she did not want to go to jail.

253. On or about November 13, 2006, Ms. Lewis opened her interoffice mail and learned from an Official Personnel Action that Ms. Noceda and Ms. Norman were reassigned to Katmai permanently.  Nobody ever told any of the women that this was the plan. So two employees who had been slacking off and unconcerned about the impression they were making with Ms. Lewis and their coworkers were now faced with the realization that they had been offending their permanent coworkers.  Ms. Fallon undermined the Katmai program by bringing employees who did not care about the team, and then switching the plan without letting anybody who was affected know or

have a say in the change.

254. Ms. Lewis discussed the paperwork with Ms. Noceda and Ms. Norman. The employees were clearly upset. The women discussed between themselves the fact that none of them knew the transfer was going to be permanent. Ms. Noceda and Ms. Norman asked if they could speak with Sitka Director Peggy Buchanan. Ms. Lewis said that would be fine, as long as their rooms are covered and in ratio.

255. Additionally, reassigning these employees to the Katmai center was going to negatively impact the Katmai budget. This should have been something that Ms. Fallon discussed with Ms. Lewis prior to making the decision to transfer the employees.

256. Around 4:00 p.m. Virginia Murray spoke with Ms. Lewis about Miranda Phillips' statements that Ms. Phillips planned to go on a killing spree and she had a list of names. Ms. Lewis called Ms. Fallon right away but Ms. Fallon was not in her office. Ms. Lewis then called George in Human Relations and asked what to do. George said to give him a few minutes and he would call the suicide intervention program. George called right back and said he got a hold of Susan Fallon. Susan Fallon was laughing when George put her one the line. Ms. Fallon asked Ms. Lewis to tell her what happened. She kept laughing while Ms. Lewis was telling her what had happened. Ms. Lewis told Ms. Fallon it was not funny. Ms. Fallon said, "I know, I know." But Ms. Fallon continued to laugh. Ms Fallon told Ms. Lewis that George had Life Skills people on the phone and they wanted to talk to her.

257. Life Skills called Ms. Lewis and the man gave her instructions to try to get Miranda Phillips to the hospital. Ms. Lewis called Susan Fallon to come and get Ms. Phillips to take her to the hospital. Susan Fallon said, "You take her." Ms. Lewis said "No, I have to manage the facility. There is nobody to manage the facility if I leave." Ms. Lewis also told Ms. Fallon that she is afraid of Ms. Phillips and there is no way she is allowing Ms. Phillips into her car. Ms. Fallon still wanted Ms. Lewis to take Ms. Phillips, but Ms. Lewis put her foot down and said "no." Ms. Lewis said that if Ms.

Fallon was not comfortable taking her, Ms. Lewis would call the emergency medical team to come and pick her up.  When Susan Fallon showed up Ms. Lewis explained to Ms. Fallon about attempting to talk with Ms. Phillips that morning about showing up late for work. Ms. Lewis called Miranda Phillips into her office and explained what had been said and that she needed to go with Ms. Fallon.  Both Ms. Fallon and Ms. Lewis confronted her.  Ms. Phillips would not admit that she said she was planning on going on a killing spree.  Ms. Lewis asked Ms. Phillips to gather her things so she could go with Susan Fallon.  When Ms. Phillips did so, Ms. Fallon said to Ms. Lewis, "You owe me big time for this."  Susan Fallon took Ms. Phillips to the emergency room.

258. Later that evening Col. Borgert held a meeting where he called all Family Services employees in after work.  Employees were supposed to get two hours of overtime or compensatory time for coming in after hours.  Ms. Lewis attended the meeting.

259. Col. Borgert said that there were so many problems in the flight and the flight needed to come together and get healing.  He wanted everyone to work together as a team.  No specifics were addressed.

260. At the meeting Ms. Lewis spoke with Ms. Fallon and Ms. DeShasier about Miranda Phillips.  Susan Fallon said that she was doing OK and "she was just stressed."  Susan Fallon still did not appear to take the threats seriously.  Ms. Fallon recommended to Kathie DeShasier that Ms. Phillips be permitted to come back to work.  Ms. Lewis objected.  After discussing the matter with Ms. Fallon, Kathie DeShasier said Ms. Phillips was just having a meltdown.  Ms. Lewis said, "No, this is serious."  Ms. DeShasier just wanted to have the incident reported in Ms. Phillips' record but have her come back to work.

261. On or about November 14, 2006, Ms. Phillips came to work but went to Susan Fallon's office.  Ms. Fallon filled out a Leave Slip for Ms. Phillips and approved it, allowing Ms. Phillips to take annual leave and sick leave from November 14 - November 17, 2006.

262. The staff at Katmai told Ms. Lewis that if Ms. Phillips came back, they would walk off the job.  They wanted to call Security Forces to investigate.  Ms. Lewis agreed with their request.  Security Forces came and interviewed the employees who heard Ms. Phillips make her threat; Capricia Turner, Melanie Ginn-Williams and Karen Johnson.  The investigator also interviewed Ms. Lewis.

263. When the interview was over, Ms. Lewis went over to see Susan Fallon at the main office.  Ms. Lewis wanted clarification about how much overtime/compensatory time was going to be given for the meeting with Col. Borgert the previous evening.  Ms. Lewis heard it was only a half an hour, but they are supposed to give a minimum of two hours whenever people are called back into work.  Ms. DeShasier and Ms. Fallon said the meeting was not considered a call back since it was a scheduled meeting.  Ms. Lewis noted that the rule applies any time somebody goes home, but must come back to work later.

264. On or about November 15, 2006, Criminal Investigations Officers came over and followed up on the information they received from Security Forces.  They explained to Ms. Lewis that they took the threat very seriously.  Criminal Investigations Officers re-interviewed everyone.  Investigators advised employees, including Ms. Lewis, to get restraining orders.

265. On or about November 16, 2006, Ms. Lewis scheduled an appointment with Dr. Beverly Hendelman based upon therapist Hugh Fisher's recommendation.

266. Ms. Lewis left work at around noon and went to Good Samaritan to meet with Dr. Hendelman.  Hugh Fisher referred Ms. Lewis to Dr. Hendelman because he had become concerned with Ms. Lewis' health and stress level.  He stated Ms. Lewis needed to be evaluated for medication.  Dr. Hendelman interviewed Ms Lewis, asking questions and reviewing the file that Hugh Fisher gave to her.

267.  At the end of the interview, Dr. Hendelman recommended taking medical leave to remove Ms. Lewis from the stressful work environment.  Dr. Hendelman explained that it sounded like managers were using stress as a technique to get rid of Ms. Lewis.

Dr. Hendelman wrote a note for Ms. Lewis to give to her supervisor requesting 120 days of leave.  Ms. Lewis attempted to fax Dr. Hendelman's note to Ms. Fallon.

268. On or about November 17, 2006, Ms. Lewis called in to Ms. Fallon to let her know that the doctor have her an excuse to be off work for 120 days due to stress, so she would not be coming in to work.  Ms. Fallon did not answer her phone.  Ms. Lewis left voice mail messages on Ms. Fallon's machine.  Ms. Fallon never called Ms. Lewis back.  Ms. Lewis called Ms. Veasey, Ms. Fallon's and Ms. DeShasier's secretary, and told Ms. Veasey also that she would not be in to work and about the 120 days she needed to take off from work.

269. On or about November 17, 2006, Ms. Lewis called Nancy Barlow at Elmendorf Worker's Compensation office and told her that her doctor had placed her on medical leave and that she needed the paperwork to fill out to get it to worker's compensation.  Ms. Barlow said she could stop by and pick it up.  Ms. Lewis went to Ms. Barlow's office.  Ms. Barlow told Ms. Lewis that she had spoken with Dianne Harrison and that she needed Ms. Lewis to  fill out one packet for the Family Medical Leave Act and one packet for Worker's Compensation.

270.  The strange thing about the Family Medical Leave Act paperwork was that this time it had an extra sheet on it that was different from the Family Medical Leave Act packet Ms. Lewis was told to complete, and Dr. Trombley completed, on March 5, 2004.  The new cover sheet has nothing to do with the Family Medical Leave Act, since the Family Medical Leave Act requires Medical Certification, not Medical Documentation.

271. On or about November 20, 21 and 22, 2006, Ms. Lewis placed more calls to Ms. Fallon to let her know she was taking medical leave.  Again, there was no answer so Ms. Lewis left messages on Ms. Fallon's voice mail.

272. Ms. Fallon authorized 54 hours of paid administrative leave for Miranda Phillips.  Ms. Phillip's leave without pay status was converted to administrative leave from November 21 to November 30.

273. On or about November 22, 2006, Ms. Lewis went to Fred Meyers at 9:00 a.m. and faxed the note from Dr. Hendelman to Ms. Fallon. Ms. Lewis called Nancy Veasey to verify receipt of the fax. Ms. Veasey said she had not received it. So Ms. Lewis went into the office to hand deliver Dr. Hendleman's note to Susan Fallon. Ms. Fallon was not there so Ms. Lewis gave it to Kathie DeShasier. When Ms. DeShasier looked over the note she said that it was unacceptable and that she needed more. Ms. Lewis said that Dr. Hendelman has the Family Medical Leave Act paperwork and she is working on it and plans to have it completed by Tuesday, November 28, 2006. DeShasier said that is not acceptable and she needed the paperwork that day. Ms. Lewis said she would go by Good Samaritan and see if she could get it.

274. Ms. Lewis called Good Samaritan and spoke with Gena O'Neal, the office manager. Ms. O'Neal explained that Dr. Hendelman had patients all day. Ms. O'Neal provided a signed letter from Dr. Hendelman reiterating that Ms. Lewis suffered from "Post Traumatic Stress Disorder and Adjustment Disorder Mixed" and that Ms. Lewis "is suffering from work related anxiety and depression." The letter restated that Ms. Lewis was to be released from work for 120 days while undergoing treatment. Ms. Lewis drove to Good Samaritan and picked up the letter, and then drove back to Elmendorf and brought it to Ms. DeShasier. Ms. DeShasier reviewed the letter. Ms. DeShasier said the letter was unacceptable and that she needed the entire paperwork filled out by Dr. Hendelman. Ms. DeShasier told Ms. Lewis that she would mark Ms. Lewis absent without leave until Ms. Lewis handed in her Family Medical Leave Act paperwork.

275. Ms. Lewis felt very disturbed about this. Ms. Lewis was supposed to be resting, but instead Ms. DeShasier was having her run all over the place. Ms. Lewis returned to Good Samaritan and told Gena O'Neal that Ms. DeShasier needed the Family Medical Leave Act forms completed. Dr. Hendelman finished the packet, form WH-380, right quick and gave it to Ms. Lewis. Ms. Lewis drove back to Elmendorf and brought her completed form WH-380 to Ms. DeShasier. DeShasier said that was not what she

needed.  Ms. DeShasier told Ms. Lewis that she was getting Worker's Compensation mixed up with Family Medical Leave Act paperwork, even though the document clearly states on the top of the sheet that the WH-380 form is Family Medical Leave Act paperwork.  Ms. DeShasier told Ms. Lewis that she wanted everything listed on the top sheet entitled "Medical Documentation" even though the Family Medical Leave Act only requires Medical Certification.

276. Ms. DeShasier repeatedly threatened Ms. Lewis that if she did not turn over her confidential medical information, that Ms. DeShasier would place her in absent without leave status.  Ms. Lewis provided all documentation necessary under the Family Medical Leave Act, a completed medical certification from Dr. Hendelman on form WH-380.

277. On or about November 26, 2006, Ms. Fallon originally granted Ms. Lewis leave with respect to her Family Medical Leave request using a combination of official time and Annual Leave ("A.L.").  Ms. Fallon instructed Ms. Veasey to enter Ms. Lewis' time off as official time and annual leave on a sticky note placed on the time sheet.

278. On or about November 29, 2006, Ms. Fallon sent Ms. Lewis a proposed suspension letter via mail.  In the letter, Ms. Fallon gave Ms. Lewis 24 hours to respond.

279. On or about November 30, 2006, Ms. Lewis turned in a packet of leave requests so she would receive sick pay through her term of Family Medical Leave 120.  Ms. Lewis is entitled to do this under 5 C.F.R. Section 630.1205(b).  The agency is not supposed to deny Family Medical Leave even if the requester's notice is deficient.  5 C.F.R. Section 630.1205(e).

280. On or about November 30, 2006, Ms. Lewis checked her earning statement online. Kathy DeShasier had charged Ms. Lewis with 24 hours (3 days) of absence without leave.  This puts a black mark on Ms. Lewis' attendance because that only happens when a person does not show up for work and does not call in or otherwise let people know.   The usual practice was to put an employee in leave without pay status if an employee calls in and lets her supervisor know what is happening.

281. On or about November 30, 2006, at 4:30 p.m. Ms. Lewis received the proposed suspension letter Ms. Fallon mailed the day before.  Ms. Lewis became very upset that they were still trying to harass her even when she was on medical leave.  She felt like she could not get away from the harassment even when she was not at work.  It was even more stressful in that she was required to respond to the suspension proposal within 24 hours.

282. On or about December 1, 2006, Ms. Lewis sent an email to Ms. DeShasier asking for an extension of time to file her rebuttal.

283. On or about December 5, 2006, Ms. Lewis received a response back from Ms DeShasier via email that she has until tomorrow to file her rebuttal.

284. On or about December 6, 2006, Ms. Lewis filed her first paperwork with respect to responding to the proposed suspension.

285. On or about December 8, Ms. Lewis filed the remainder of her rebuttal to the proposed suspension.

286. In her response, Ms. Lewis again explained that the charges brought against her were fabrications and provided statements from other employees and a newspaper clipping.  Ms. Lewis explained that the caregivers at the Sitka Center had not been trained properly by the staff there, and there was difficulties with bringing Ms. Noceda and Ms. Norman over from the Sitka Center just as she had warned Ms. Fallon and Ms. DeShasier.   Ms. Lewis described how she felt harassed and intimidated by the actions of Ms. Fallon.

287. On or about December 9, 2006, Ms. Lewis was paid for the twenty four hours she used for her paid medical leave.  Ms. DeShasier threatened to take this back if Ms. Lewis did not bring in her medical records from Good Samaritan.

288. On or about December 12, 2006, Ms. DeShasier granted Ms. Lewis 18 hours of compensatory time, but denied 56 hours of Leave Without Pay for November 30 - December 9, 2006.

289. On or about December 13, 2006, Ms. Lewis emailed Ms. DeShasier explaining that

everything was provided as requested on the medical certification form. She asked Ms. DeShasier to explain what more she needed.

290. On or about December 15, 2006, Ms. DeShasier emailed Ms. Lewis back claiming that she needs documentation as outlined in 5 C.F.R. 339 and Air Force Instruction 36-815. Ms. DeShasier stated she was doing a corrective timecard to mark Ms. Lewis absent without leave. 5 C.F.R. 339 does not govern Family Medical Leave. 5 C.F.R. 630.1201 et.seq. governs Family Medical Leave, and Air Force Instruction 36-815 chapter 10 states so and follows 5 C.F.R. 630.1201.

291. On or about December 19, 2006, Ms. Lewis sent an email to Angie Horn in Human Resources asking for assistance in knowing what to provide with her request for Family Medical Leave. She indicated in the email that she had already spoken with Al Anderson and did not understand what more information was needed since her documentation appeared to be in compliance with what was required.

292. On or about December 21, 2006, Ms. Horn responded to Ms. Lewis' email stating that she should get in touch with Dianne Harrison and Al Anderson.

293. On or about December 21, 2006, Ms. Lewis emailed Dianne Harrison and Al Anderson for a policy clarification on what is needed under the Family Medical Leave Act.

294. On or about December 22, 2006, Al Anderson emailed Ms. Lewis back advising Ms. Lewis to provide her medical documentation.

295. On or about December 23, 2006, Ms. Lewis received her Civilian Leave and Earning Statement. Ms. DeShasier marked her absent without leave and took back the time previously given for sick leave.

296. On or About January 2, 2007, Ms. Lewis spoke with Al Anderson in Human Resources via telephone. She again asked Mr. Anderson what exactly it was that she needed to complete her Family Medical Leave Act request. Mr. Anderson provided her with a packet with copies of excerpts from 5 C.F.R. 630.1201 et.seq. Again, this C.F.R. information only stated a medical certification was needed, not a patient's

medical documentation.

297. Nobody ever advised Ms. Lewis that her Medical Certification form itself was incomplete.  The only response she received when she asked why it was not acceptable was that it did not contain her medical records.

298. Nobody ever asked Ms. Lewis to submit to a second opinion review as provided under the Family Medical Leave Act, 5 U.S.C. §6383(c); and supporting regulations 5 C.F.R. 630.1207(d).

299. On or about January 11, 2007, Ms. DeShasier and Ms. Fallon completed and signed Ms. Lewis's Civilian Rating of Record.  This time they scored her as either "far below successful" or "very poor."  They marked each of her employment elements as "Does Not Meet" except the fifth element.  They marked Ms. Lewis' performance rating as "N - Unacceptable."

300. On or about January 12, 2007, Ms. DeShasier sent a letter to Ms. Lewis that the proposed suspension was granted and Ms. Lewis would be suspended for five days following her leave period.

301. On or about January 13, 2007,  Ms. Lewis received a letter from Ms. DeShasier stating that she was going to suspend Ms. Lewis for five days following her leave period.  Ms. Lewis could not read the letter.  She only read he first paragraph and put it down.  She was very angry.  She was stressed and upset and she recognized they are knowingly and purposefully trying to make her Post Traumatic Stress Disorder and depression even worse.

302. On or about January 16, 2007, Ms. Lewis went to see Mr. Fisher at Good Samaritan for her regularly scheduled meeting.  She told him about the letter suspending her.  Mr. Fisher said that this should be a time of rest, but her managers' actions is undermining the treatment.

303. Ms. DeShasier continued to mark Ms. Lewis absent without leave.

304. On or about February 9, 2007, Kathie DeShasier proposed that Ms. Lewis be removed from her position.  Ms. DeShasier based her proposal on Ms. Lewis taking

sick leave without providing medical documentation.

305. On or about February 10, 2007, Ms. Lewis received the Notice of Proposed Removal.  She was surprised that Kathie DeShasier was proposing the removal when Susan Fallon was her direct supervisor.  Ms. Lewis was also shocked because nobody had told her that they were considering removing her.  Nobody had even told her she needed to come back to work.  Ms. Lewis felt shocked that they were treating her so terribly, especially knowing that she was suffering from Post Traumatic Stress Disorder.  Ms. Lewis suffered another panic attack.

306. On or about February 12, 2007, Veronica Van Buren and Gena Walker called Ms. Lewis and asked if she was coming back because Lisa Dalton was moving into the new office that was being built for Ms. Walker and Ms. Walker was put into Ms. Lewis' office.

307. On or about February 20, 2007, at 2:55 p.m. Ms. DeShasier began drafting the document that would become Col. Borgert's Termination Decision.

308. On or about February 20, 2007, at 3:45 p.m. Ms. Lewis submitted her rebuttal to the proposed termination to Kathie DeShasier.  Ms. Lewis cited the Code of Federal Regulations, explaining how the managers are citing the wrong C.F.R., how the information they are giving her is misleading and inaccurate, and how they should be requesting a second opinion if they doubt Dr. Hendelman's diagnosis.  Ms. Lewis explained how the termination over absent without leave status was a cover for discriminatory and retaliatory motives.

309. When Ms. Lewis came in to drop off her rebuttal to the proposed termination, Lisa Dalton saw Ms. Lewis and hugged Ms. Lewis and said she missed her and asked whether Ms. Lewis was coming back.  Ms. Lewis said she was coming back.

310. After Ms. Lewis left, Ms. Dalton went into the main office.  She appeared very upset.  She spoke with Susan Fallon and Kathie DeShasier about Ms. Lewis saying she would be back.   Management had already told Ms. Dalton (Caucasian) that she had the position as director of the Katmai Center.

311. On or about February 21, 2007, a Caucasian male began directing the Denali Center. Previously, the center had been run by an African American female, Fennis Baker-Waters.  Ms. Baker-Waters left and transferred to a base in North Carolina.  A significant part of Ms. Baker-Waters' decision to move her family across the United States was based on the perceived retaliation Ms. Baker-Waters she was suffering herself after she provided testimony in support of Ms. Lewis' discrimination case. Now all three Child Development Centers were run by Caucasian employees.

312. Lisa Dalton removed Ms. Noceda, Ms. Norman and Mr. Guylas from the Katmai center just as Ms. Lewis had tried to do.

313. On or about February 27, 2007 Ms. Dalton hired a Caucasian male clerk to work the position Ms. Van Buren (African American) held.  Personnel would not update Ms. Van Buren's employment brief, which prevented her from being eligible for staying in that position.  Ms. Lewis had called Jeanne Johnson at personnel and told her that the information on Ms. Van Buren's employment history was incorrect.  Ms. Lewis believes she called twice a week between for eight months and they never fixed it.

314. On or about February 27, 2007, Lt. Col. Michael Borgert signed a decision that Ms. Lewis was to be terminated effective March 12, 2007.  The basis was the alleged lack of medical documentation for her "sick leave" and made no mention of the fact that Ms. Lewis requested Family Medical Leave.

315. On or about March 2, 2007, Ms. Lewis went to see Dr. Trombley because she was having chest pains.  Dr. Trombley diagnosed stress and advised Ms. Lewis to quit her job.

316. On or about March 3, 2007, Personnel charged Ms. Lewis back for the leave they paid her, when they changed their minds and decided not to give her the leave and instead mark her AWOL.  The Air Force wanted Ms. Lewis to return $1203.84 + $288.96 for a total of $1,492.80 within 45 days.

317. On or about March 5, 2007, Ms. Lewis met with Dr. Trombley.  Ms. Lewis was continuing to experience chest pains.  She felt like she needed to see a cardiologist.

Dr. Hendelman had also recommended to go see cardiologist.  Dr. Trombley referred her to Alaska Heart Institute.

318. On or about March 9, 2007, Ms. Lewis received an email regarding her latest leave and earnings statement.  The statement showed Ms. Lewis still had 143.5 hours of annual leave, 40.35 hours of sick leave, 8 hours of compensatory time and 10 hours of travel time.  Instead of using that, the Air Force marked Ms. Lewis absent without leave for 80 hours.  No pay was provided.

319. On or about March 12, 2007, Ms. Lewis went in to have her heart tested at the Alaska Heart Institute.  The results of the EKG stated  "Baseline 12-lead electrocardiogram reveals normal sinus rhythm, normal EKG."

320. When Ms. Lewis arrived home from her Heart exam, she opened her mail. She found a letter from Col. Borgert terminating her.  Ms. Lewis suffered three heart attacks through that afternoon, evening and the early morning of March 13, 2007.

321. On or about March 13, 2007, Mrs. Lewis went to the hospital emergency room at Providence Hospital.  Dr. Merchant reviewed Ms. Lewis and suspected acute coronary symptoms.   Doctors put IV tubes in both of Ms. Lewis' arms for testing and to administer fluids.  A series of Tests were run.  The EKG showed problems.  She was diagnosed with acute coronary syndrome.   Dr. Gray said that she believed it would be good to implant a stent.  She discussed the risks and benefits of the procedure with Ms. Lewis.  Ms. Lewis was in the Emergency Room until 6:30 a.m.  At that time medical personnel took her into the cardiac surgery unit and prepped Ms. Lewis for the procedure.  They administered local anesthetic.  Dr. Peterson performed cardiac stent implant surgery. Dr. Kutchera checked on Ms. Lewis from time to time and created orders for her stay in the Cardiovascular Intensive Care Unit.

322. The defendants engage in a pattern and practice of discrimination and retaliation against minority employees and employees who bring charges of discrimination or testify, assist or participate in the investigation of charges and other enforcement

proceedings.

323. All conditions precedent to filing this action have been met.

## CLAIM I

### VIOLATION OF TITLE VII – DISPARATE TREATMENT IN HIRING AND PROMOTION, COMPENSATION AND TERMS, CONDITIONS AND PRIVILEGES OF EMPLOYMENT:  42 U.S.C. §2000e-2(a)(1)

324. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

325. The defendants discriminated against Ms. Lewis on the basis of race.

## CLAIM II

### VIOLATION OF TITLE VII – DISPARATE TREATMENT IN SEGREGATION:  42 U.S.C. §2000e-2(a)(2)

326. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

327. The defendants discriminated against Ms. Lewis on the basis of race.

## CLAIM III

### VIOLATION OF TITLE VII – DISPARATE IMPACT IN HIRING AND PROMOTION, COMPENSATION AND TERMS, CONDITIONS AND PRIVILEGES OF EMPLOYMENT: 42 U.S.C. §2000e-2(a)(1)

328. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

329. The defendants discriminated against Ms. Lewis on the basis of race.

## CLAIM IV

### VIOLATION OF TITLE VII – DISPARATE IMPACT IN SEGREGATION:  42 U.S.C. §2000e-2(a)(2)

330. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

331. The defendants discriminated against Ms. Lewis on the basis of race.

## CLAIM V

### VIOLATION OF TITLE VII – RETALIATION: 42 U.S.C. §2000e-3(a)

332. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

333. The defendants discriminated against Ms. Lewis on the basis of her attempt to oppose unlawful employment practices.

## CLAIM VI

### UNLAWFUL REMOVAL FROM EMPLOYMENT 5 U.S.C. § 7702

334. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

335. The defendants removed Ms. Lewis from her position of employment for reasons other than the efficiency of the agency on or about March 12, 2006.

336. The defendants' removal of Ms. Lewis from her position was not accomplished for reasons that serve to support the efficiency of the agency.

337. The defendants' removal of Ms. Lewis was unlawful pursuant to the federal Family Medical Leave Act, 5 U.S.C. 6381 et. seq.

## CLAIM VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

338. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

339. The defendants acted intentionally to inflict emotional damage upon Ms. Lewis.

## CLAIM VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

340. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

341. The defendants failed to act with reasonable care, and in doing so, inflicted

emotional damage upon Ms. Lewis.

## CLAIM IX

### NEGLIGENT SUPERVISION

342. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

343. The defendants failed to use reasonable care in managing and supervising their employees, and in doing so, damaged Ms. Lewis.

## CLAIM X

### PUNITIVE DAMAGES

344. Each of the preceding paragraphs is realleged in its entirety as if fully restated here.

345. The defendants acted maliciously against Ms. Lewis and/or in conscious disregard of her rights.

## DEMAND FOR TRIAL BY JURY

Ms. Lewis requests a jury trial on all issues so triable.

## REQUEST FOR RELIEF

Ms. Lewis requests the following relief:

A. For an injunction and equitable relief authorized under 42 U.S.C. § 2000e-5(g).

B. For an award of economic damages authorized under 42 U.S.C. § 2000e-5(g) in an amount to be proven at trial.

C. For an award of compensatory damages against the defendants in an amount to be proven at trial.

D. For an award of punitive damages in an amount to be proven at trial.

E. For a final judgment in favor of Ms. Lewis which (i) declares her the prevailing party on each of her claims, (ii) grants her leave to move for the maximum amount of attorney's fees and costs available under the law, and (iii) grants her the maximum

amount of pre-judgment and post-judgment interest allowable by law; and

F. For a final judgment that provides Ms. Lewis with any other relief as may be just and proper under the circumstances.

Respectfully submitted this 15th day of May, 2008.

/s/ Nicholas Kittleson
Nicholas Kittleson, Esq.
ABA # 9711090
Counsel for the plaintiff
9058 Dewberry Street
Anchorage, Alaska  99502
(907) 345-0830 phone
(907) 243-0125 fax
nicholas@gci.net email

I certify that on the 15th day of May, 2008
A copy of the foregoing "Third Amended Complaint"
 was delivered electronically to:
Susan J. Lindquist, Esq.
susan.lindquist@usdoj.gov

/s/ Nicholas J. Kittleson