# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

JANET D. LEWIS,                          )
                                         )
            Plaintiff,                   )        3:06-cv-00053-JWS
                                         )
    vs.                                  )        ORDER AND OPINION
                                         )
MICHAEL B. DONLEY, Secretary             )        [Doc. 97, 114, 118, 123, and 126]
of the United States Air Force; the      )
UNITED STATES OF AMERICA,                )
                                         )
            Defendants.                  )
_____ )

## I.  MOTIONS PRESENTED

At docket 97, defendants Michael B. Donley and the United States of America
(the "government") move to dismiss plaintiff Janet D. Lewis' ("Lewis") tort claims
pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Lewis opposes the
motion at docket 106.  The government replies at docket 115.  The government also
moves at docket 114 for leave to file additional factual materials in support of its motion
at docket 97.  Lewis opposes the motion at docket 116.  The government replies at
docket 122.  In addition, Lewis moves for summary judgment on her retaliation claim at
docket 118.  The government opposes the motion at docket 125 and cross-moves for
partial summary judgment at docket 126.  Lewis replies at docket 128 and opposes the
government's cross-motion at docket 134.  The government replies at docket 137.
Both parties have also moved for extensions of time.  The government moves for an
extension of time to file dispositive motions and motions *in limine* at docket 123.  Lewis

opposes the motion at docket 129. The government replies at docket 136. Oral argument was not requested and would not assist the court.

## II. BACKGROUND

Lewis was an employee of the United States Air Force, 3rd Wing, at Elmendorf Air Force Base in Anchorage, AK. Lewis is African-American. Lewis worked in the Child Development Center Program on Elmendorf Air Force Base and, in March 2002, she was transferred into the position of director of the Katmai Child Development Center. During 2002 and 2003, the Air Force built a new child care center, the Sitka Center. At a January 14, 2003 staff meeting, Lee Tomlinson, chief of the Pacific Command Air Force services, and Susan Fallon, the child development program manager, announced that they would be taking applications for the directorship of the Sitka Center. Tomlinson indicated the Katmai Center would be renovated and that its program would be kept in place. Tomlinson also stated that he intended to keep Lewis and Gena Walker, another Katmai employee, at the Katmai Center. Walker is also African-American.

On March 12, 2003, Lewis saw the job announcement for the Sitka Center directorship position, and she applied. One month later, the Sitka Center opened, and Lewis moved the Katmai operations to the new building in order to permit the Katmai Center to be renovated. The parties dispute whether Lewis was installed as director of the Sitka Center at that time - Lewis claims she assumed the role of director, while the government claims that Lewis remained director of the Katmai Center. On or about April 16, 2003, the list of qualified candidates for the position of Sitka Center director was certified. Among the qualified candidates were Lewis and Mary Barkley, a Family Child Care Center employee. Tomlinson recommended to Fallon and Mr. Bartz, the flight chief for family member services, that they hire Barkley instead of Lewis as the director of Sitka Center. Bartz and Fallon reviewed the applicants' referral briefs and scored the applicants based on the information contained in those briefs. On May 9, 2003, Bartz and Fallon conducted an interview with Lewis for the Sitka Center directorship. On May 23, 2003, Bartz selected Barkley for the directorship. Lewis made

Case 3:06-cv-00053-JWS   Document 140   Filed 05/28/09   Page 2 of 24

several inquiries of Bartz, Fallon and the personnel department to determine her scores on the interview matrix, but Lewis was unable to review her scores. Lewis filed a complaint with the Equal Employment Office of the Air Force on September 2, 2003, alleging illegal racial discrimination in the selection of Barkley over herself.

After Lewis filed her claim with the EEO, she alleges that the child development center management engaged in systematic retaliation for her complaint. Specifically, Lewis claims that Fallon and others overworked her, yelled at and bullied her, disregarded requests for correction of abusive behavior, denied her leave requests, and generally undermined Lewis' ability to do her job. The following is a summary of those allegations and related facts. On June 13, 2003, Fallon asked Lewis to assist Barkley in taking over the Sitka Center and gave Lewis a deadline of June 20, 2003 to leave the main building. Lewis complied with Fallon's requests. On July 10, 2003, Bartz sent an e-mail to Fallon suggesting that Lewis handle a playground certification training program, which Fallon forwarded to Lewis. In the meantime, Lewis was working on renovations to the Katmai Center and preparing for the reopening. Walker and Rosa Adams, another Katmai Center employee, were assigned at the time to assist Barkley in learning how to manage the Sitka Center. Lewis had surgery scheduled during that time period as well, and alleges that she felt overwhelmed. As a result, Lewis e-mailed Fallon regarding her inability to handle the certification program. On August 12, 2003, Lewis was cleared by her doctor to return to work full time. Despite Lewis' protestations about taking on the playground certification, Fallon and Bartz insisted she organize the training. Lewis alleges that, as a result, she had to spend extra hours at the office, and that she had never been tasked with so much work. Dianne Harrison, supervisor of employee relations, instructed Fallon to give Lewis a direct order in the event Lewis refused to perform certain tasks to "be prepared for the fallout of her claiming reprisal for filing an EEO complaint." Lewis nevertheless successfully organized the playground certification training.

On October 13, 2003, Lewis visited Dr. Dale Trombley for work-related stress and anxiety. Later that week, Fallon instructed Lewis to stay out of the Sitka Center building, although it is unclear what prompted such action. On October 30, 2003, Lewis

-3-

met with Tony Kobussen, deputy chief of the 3rd Wing, to discuss her employment situation. As Lewis explains it, she told Kobussen that she was being overworked and treated differently than other employees. Lewis also alleges that Kobussen promised to review the situation and contact her, but claims that Kobussen ignored her complaints. Lewis approached Kobussen several other times to complain about her workload, and Kobussen discussed Lewis' complaints with Fallon and Bartz. Lewis claims that these meetings resulted in Fallon tasking her with more work. Lewis again asked for stress-related sick leave in December 2003, which Fallon initially denied. Lewis nevertheless met with a doctor over her lunch break and procured a note authorizing Lewis to take the afternoon off. Fallon asked Lewis to fill out a new leave request form to reflect the time Lewis would be away. In early February 2004, Lewis appears to have gotten into two disputes with Barkley over access to a meeting room and the cleanliness of Lewis' pre school classroom, which led Barkley to cease all communications with Lewis. Lewis was written up by Fallon for both incidents. On March 5, 2004, Dr. Trombley certified Lewis for two weeks of medical leave pursuant to the Family Medical Leave Act. Lewis submitted the certification to the personnel department and, on April 2, 2004, Lewis was approved for leave.

Upon her return to work, Lewis was scheduled to have a meeting with Lieutenant Colonel Gary Dzubilo, services commander of the 3rd Wing. Lewis attended the meeting with her EEO representative, Ibraahiym Kadeesh. When Kadeesh introduced himself to Lt. Col. Dzubilo, he canceled the meeting and indicated that he wanted to meet with Lewis alone. Two days later, Lewis met with Lt. Col. Dzubilo and Kobussen by herself. Although Lewis claims that this meeting was intended to be disciplinary in nature, the government denies this contention. After the meeting and throughout the remainder of 2004, Lewis alleges that Fallon and others continued to treat her unfairly. For example, Lewis alleges that Fallon unfairly gave her lower than usual annual ratings, that she was not recommended for a bonus, and that she did not receive an increase in pay for the first time. Moreover, Lewis alleges that Fallon placed negative comments in her file for discussing possible employment openings with another employee.

-4-

In June 2004, Lewis returned to the Katmai Center, which had been renovated. Lewis alleges that the renovation did not remedy all of the center's problems, including ineffective heating and cooling, black mold, and inadequate ventilation. Lewis claims broadly that while the Sitka center was fully funded, management failed to request sufficient funds for the Katmai Center. It is undisputed that management determined that the Katmai Center was to be a facility for infants and toddlers, while the Sitka Center was to be a facility for school aged children. Lewis claims that this allocation "guaranteed that the center would lose money" and that she was held responsible for poor fiscal management. In addition, Lewis claims that all Caucasian employees were being routed by management to the Sitka Center, while the Katmai Center was staffed almost exclusively with minority employees. The government denies these contentions.

In October 2004, the parents of a child in the Katmai Center, the Pattersons, requested that their child be transferred to the Denali Child Development Center, another facility on base. While Lewis was processing the request, Mr. Patterson lost his job. Because base policy required both parents to be employed or in school in order to use the child care facilities, the Pattersons no longer qualified and the Denali center denied their request for transfer. The Pattersons therefore sought to make arrangements in the Sitka Center. Lewis, under pressure from management to keep her empty rooms filled, gave the Pattersons' slot to another family on the waiting list. The Pattersons ultimately obtained a slot in the Sitka Center and never went a day without day care. However, Lewis was later written up by Fallon for giving away the Pattersons' slot. When Lewis inquired of Fallon regarding the policies she was alleged to have violated, Fallon responded that there were no such policies governing her conduct. Shortly thereafter, on October 6, 2004, a child at the Katmai Center left the premises without anybody seeing her do so. Because Lewis was out on personal leave, Fallon was responsible for conducting the initial investigation and interviewing the caregivers who were watching the children. Upon her return to work, Lewis was tasked with disciplining the caregivers. Lewis decided that retraining would be an appropriate disciplinary measure, while Fallon disagreed. Lewis was ultimately reprimanded by

Fallon for failing to consult with her on the disciplinary action to be taken with respect to the caregivers.

On March 15, 2005, Fallon scheduled a marketing meeting for all employees in the child care centers and stated that everyone was expected to attend. Lewis had a new clerk, who scheduled job applicant interviews at the time of the marketing meeting. Lewis missed the meeting because she was conducting interviews at the time. Fallon explained to Lewis that the meeting was mandatory, and that Lewis should have rescheduled the interviews. On June 16, 2005, Lewis received her 2005 evaluation and was given very low scores. Again, Lewis was not recommended for a bonus or a raise. Lewis alleges that in early July 2005, she entered counseling to help cope with her work-related stress and anxiety. On July 12, 2005, Lewis met with Colonel Robert Douglas and Harrison, supervisor of employee relations, to discuss her evaluation. Harrison thoroughly explained the rating criteria and how the process works. Lewis alleges that she did not receive mid-year feedback from Fallon and that she could not be expected to improve if she was not informed of her failings. Two days later, Lewis was given a notice of proposed suspension by Fallon and, on August 31, 2005, Lewis was suspended for two weeks without pay.

Prior to Lewis' suspension, on August 22, 2005, Fallon gave sworn testimony to the Department of Defense Office of Compliance Investigation investigator Barbara Eves. In her testimony, Fallon stated that Al Anderson of employee management relations told her that it was Fallon's, not Lewis', obligation to find a substitute employee to handle Lewis' responsibilities while she was on leave. Nevertheless, on September 14, 2005, Lewis reported back to work and was immediately reprimanded by Fallon because Walker, one of Lewis' subordinates, missed a meeting while Lewis was on approved leave. Lewis complained to Deshaiser, who allegedly knew what Fallon had done. Lewis subsequently went to see Kobussen and then Col. Scotty Lewis. Kobussen called Lewis back later and assured her that she would not be written up for the incident. On September 15, 2005, Lewis received a letter from Col. Lewis, which stated that it would be inappropriate for the Wing Commander to intervene in the EEO process because of the potential "to negate the impartiality and integrity of the program

-6-

which are the checks and balances of the EEO process."  Lewis alleges that Col. Lewis'
letter amounted to a denial of chain of command redress that discouraged her from
engaging in the EEO process.

On November 16, 2005, Lewis met with Fallon for her mid-year review.  Fallon
marked Lewis down on element two of her mid-year review, noting that Lewis had been
insolent in refusing to sign a revised performance appraisal for one of the Katmai Center
employees.  Lewis was also marked down for disrespectful comments she allegedly
made in the presence of a subordinate.  Lewis was also allegedly marked down for
various other transgressions, including an incident in which Lewis apparently caused the
Katmai Center to run out of baby formula (which Lewis denies) and an incident in which
Lewis complained about the lack of working toilets in the center's adult bathroom.   On
February 9, 2006, Lewis requested leave for February 10 to work on her EEO case and
February 14 for annual leave.  On February 9, 2006, Fallon denied Lewis' request and,
the next day, denied Lewis' request for reconsideration.  Fallon noted that the reason for
denial was that the Katmai Center was scheduled to be inspected during the week in
question.  On February 28, 2006, Lewis alleges she requested official time off to be able
to work on her EEO case.  Fallon allegedly asked Lewis to identify the individual who
would be supervising the Katmai Center during Lewis' absence, despite apparently
knowing, based on Fallon's testimony to the Office of Complaint Investigation, that it
was her duty to find a substitute.  Lewis subsequently filed this lawsuit on March 8,
2006.

On March 28, 2006, Lewis again requested leave.  Fallon informed her that she
would not sign Lewis' leave application until she found someone to run the center in her
absence.  Lewis alleges that she again complained to Fallon that she had to procure her
own coverage, while other directors had assistants who could perform their duties in
their absence.  On April 26, 2006, Lewis received a copy of a memorandum issued by
the Air Force stating that the child development centers had lost over $128,000 in the
fourth quarter of 2005.  As a result, center employees were directed to "tighten [their]
belts."  On May 19, 2006, Fallon gave Lewis her annual review.  Lewis contends that
she received extremely low ratings and was again not awarded a bonus.  Moreover,

because Fallon refused to show Lewis her entire core personnel document (which included a job description), Lewis declined to sign her evaluation. In July 2006, Lewis was authorized to take two weeks leave, from July 14 to August 4, 2006. Upon her return, Lewis alleges she discovered that no one had performed her duties while she was away, and that there were numerous tasks left undone. When Lewis sought to have overtime approved in order to permit her to get caught up, Fallon denied her request. Lewis claims that she "felt like an outsider and an outcast, blackballed and disrespected." Lewis filed her second amended complaint with this court on September 1, 2006.

On September 5, 2006, Fallon provided Lewis with another evaluation, which Lewis again declined to sign. Lewis alleges that her ratings were low and contained inaccurate and unfair statements. Shortly before this review, Lewis and the Katmai Center were successfully accredited by the National Association for the Education of Young Children ("NAEYC"). Lewis received several awards from the Pacific Air Forces for her role in preparing the Katmai staff for the accreditation. On September 20, 2006, Fallon and Kathie DeShasier, the new flight chief for family member services, met to discuss lending employees from the Sitka and Denali Centers to Katmai to undergo NAEYC accreditation. On September 22, 2006, Fallon called Lewis to inform her that the Denali and Sitka caregivers would be visiting the Katmai Center on September 27 for accreditation training. On the day of the training, Fallon attended the welcome session of the accreditation training. Lewis alleges that Fallon would not have typically attended this meeting, but did so because Lewis accused Fallon of harassment and intimidation. As a result, Lewis halted the meeting in order to complain to Kobussen, who allegedly expressed understanding about Lewis' situation. Lewis alleges that Kobussen told her that he would brief the commander on the situation, but never did. After her meeting with Kobussen, Lewis returned to the welcome session. Lewis and Fallon spoke with the caregivers and gave them their assignments.

On September 28, 2006, Lewis requested two hours of leave to go to a conference regarding special needs children at one of her foster children's schools. DeShasier denied the leave request and explained that Lewis needed to ensure

-8-

coverage of the Katmai Center. Although Lewis alleges that it was management's responsibility to find coverage in her absence, the government claims that it was Lewis' responsibility to ensure internally that the Katmai Center was adequately staffed. Chelley Correa, another Katmai employee, was available to cover for Lewis that day. However, Lewis alleges that only DeShasier had the authority to ask Correa to take charge of the facility because Lewis is not Correa's superior. The government denies that DeShasier was the only person who could request Correa to cover for Lewis. On October 10, 2006, Lewis again requested leave to work on her EEO case, which was denied by Fallon. On October 17, 2006, Lewis requested sick leave for October 18 for four hours and October 31 for two and a half hours. Fallon approved the leave for October 18, but denied leave for October 31 because a consultant representing NAEYC would be visiting the Katmai Center.

On October 26, 2006, Fallon took disciplinary action against Lewis relating to her behavior during the NAEYC welcome session. On October 31 and November 1, 2006, Lewis observed Fallon getting statements from certain Sitka Center caregivers, who had been transferred to Katmai Center. Lewis alleges that Fallon was obtaining statements from the caregivers in order to support further disciplinary action against Lewis. In response, Lewis filed another complaint with the EEO. In addition, Lewis alleges she spoke with Kobussen about the situation and that he promised to get back to her, which Lewis claims he never did. Lewis returned to the Katmai Center to attend a team meeting, but did not stay. Instead, she asked Fallon for leave in order to see a doctor and address her EEO claim. The employees who witnessed this incident wrote statements about Lewis' behavior on November 1, 2006, and indicated that Lewis appeared upset about the fact that Fallon was collecting statements from Katmai employees. Lewis subsequently went to see her therapist. Upon her return to the Katmai Center, Lewis confronted Katrina Norman, a center employee, about whether she had written a statement for Fallon regarding Lewis' behavior. Lewis alleges Norman felt that she was caught in the middle of a dispute between Lewis and the center management. The event apparently left Norman crying in the lounge at the Katmai Center. Lewis alleges that Norman wrote a letter to Fallon requesting to be sent

-9-

back to the Sitka Center.  Norman was ultimately given a permanent assignment in the Katmai Center.  After the incident, Lewis allegedly went to see her primary care physician, whose assistant gave her some medication to calm down and provided her with a note to take the remainder of the week off.

On November 13, 2006, Miranda Phillips, a Katmai food service employee, announced in the break room that she intended to kill people at the Katmai Center.  Later that day, Phillips' threats were brought to Lewis' attention.  Lewis alleges that she contacted management, who put her in touch with a suicide prevention specialist at Life Skills, who instructed Lewis to take Phillips to the hospital.  Lewis and Fallon discussed transporting Phillips to the hospital and ultimately it was decided that Fallon would drive Phillips to the emergency room, which she did.  Later that evening, Fallon and Lewis discussed Phillips again.  Fallon reported that Phillips was doing fine and that "she was just stressed."  Fallon recommended to DeShasier that Phillips be permitted to return to work.  Lewis objected.  DeShasier approved, but noted that the incident was to be reported in Phillips' file.  Upon her return to work, Phillips requested sick leave for the period of November 14 - 17, 2006, which was granted.  Lewis alleges that the Katmai staff threatened to walk off the job if Phillips was permitted to return.  Lewis allegedly called security to interview the employees who witnessed Phillips make her threat.  On November 15, 2006, a criminal investigations office followed up on information received from security.

On November 16, 2006, Lewis alleges that she scheduled an appointment with Dr. Beverly Hendelman based on her therapist's recommendation.  Lewis claims that Dr. Hendelman recommended taking medical leave based on work-related stress, and wrote a note for Lewis authorizing 120 days of leave.  The next day, Lewis notified management that she would be requesting 120 days of leave pursuant to Dr. Hendelman's authorization.  Lewis alleges that she called Fallon several times, left her voicemail messages, and stopped by the worker's compensation office to retrieve worker's compensation and Family Medical Leave Act forms.  On November 20, 21, and 22, 2006, Lewis alleges that she tried to reach Fallon again, but was directed to her voicemail.  On November 22, 2006, Lewis claims to have faxed a copy of

-10-

Dr. Hendelman's note to Fallon from a Fred Meyer store, but that the fax was unsuccessful. Lewis therefore brought a copy of the note to DeShasier, who determined that Dr. Hendelman's authorization was insufficient to support Lewis' request for 120 days of leave. DeShasier informed Lewis that she would mark Lewis absent until Lewis submitted her FMLA paperwork. Dr. Hendelman completed the FMLA forms forthwith, and Lewis delivered the completed forms to DeShasier. DeShasier nevertheless indicated that Lewis had not provided all of the medical documentation necessary to support her FMLA application. The parties dispute whether Lewis ultimately submitted all of the required information.

On November 29, 2006, Fallon sent Lewis a proposed suspension letter via mail. On November 30, 2006, Lewis submitted leave requests for paid and unpaid leave. Shortly thereafter, Lewis checked her on-line earning statement, which reflected that she had been charged with three days of absence without leave. On the same day, Lewis received her proposed suspension letter from Fallon. The letter indicated that Lewis had 24 hours to respond or request an extension of time to respond. Lewis requested an extension of time on December 1, 2006, which DeShasier granted on December 5, 2006. Lewis filed the first part of her response on December 6, 2006 and the second part of her response on December 8, 2006. In her response, Lewis explained that Fallon had intimidated and harassed her and that the caregivers at the Sitka Center, who were assigned to the Katmai Center, were not properly trained. On December 9, 2006, Lewis was paid for the three days of sick leave on the condition that Lewis provide sufficient medical documentation. On December 12, 2006, DeShasier granted Lewis 18 hours of compensatory time, but denied 56 hours of leave without pay for the period of November 30 through December 9, 2006. On December 13, 2006, Lewis e-mailed DeShasier claiming that her medical certifications were complete. On December 15, 2006, DeShasier e-mailed Lewis explaining that she was missing certain documentation and stating that she would correct Lewis' timecard to reflect that Lewis was absent without leave.

Lewis sent an e-mail to Angie Horn in the Human Resources Department on December 19, 2006, seeking information about the requirements of an FMLA

application. On December 21, 2006, Horn put Lewis in touch with Dianne Harrison and Al Anderson, whom Lewis e-mailed on that day. On December 22, 2006, Anderson responded to Lewis advising her to provide medical documentation. On December 23, 2006, Lewis alleges that she received her leave earning statement, in which DeShasier marked her absent without leave from November 22, 2006 through December 13, 2006. Lewis alleges that Anderson provided her with a packet of materials outlining the FMLA requirements, but that none of the materials stated that medical documentation was needed. Lewis denies that she ever received notice that medical documentation was required with her FMLA application, and believed that only medical certification was required.

On January 11, 2007, DeShaiser and Fallon completed and signed Lewis' Civilian Rating of Record. They scored Lewis "far below successful" or "very poor" and marked each of her employment elements as "does not meet," except for the fifth element, which was rated "N-Unacceptable." On January 12, 2007, DeShasier sent a letter to Lewis indicating that her proposed suspension was granted and that Lewis would be suspended for five days following her leave period. Lewis alleges that the letter made her very angry and aggravated her stress. As a result, Lewis alleges that she went to see her therapist. On February 9, 2007, DeShasier proposed that Lewis be removed from her position, which she based on Lewis' failure to provide appropriate medical documentation supporting her period of leave. On February 10, 2007, Lewis alleges that she received the notice of proposed removal and suffered a panic attack. On February 12, 2007, Lewis received notice from Walker that she was moving into Lewis' office. On February 20, 2007, Lewis submitted her rebuttal to the proposed termination and on February 27, 2007, Lt. Col. Michael Borgert signed a decision that Lewis was to be terminated effective March 12, 2007. Lewis alleges that the decision was based on her lack of medical documentation supporting her FMLA leave, but the government denies this allegation.[1]

----

[1] However, as noted above, the government admits that DeShasier initially proposed that Lewis be terminated on the ground that her medical documentation was inadequate.

On March 2, 2007, Lewis alleges that she visited Dr. Trombley because she was having chest pains. She also alleges that Dr. Trombley diagnosed stress and advised her to quit her job. On March 3, 2007, the Air Force sought to have Lewis return the amount of salary paid to her for the period she was on medical leave, which management later categorized as absence without leave. On March 5, 2007, Lewis alleges that she met again with Dr. Trombley regarding her continued chest pains. Dr. Trombley referred Lewis to the Alaska Heart Institute. On March 12, 2007, Lewis alleges that she went to have her heart tested at the Alaska Heart Institute. Upon returning home, Lewis alleges that she received a letter from Lt. Col. Borgert regarding her termination. Lewis claims to have suffered three heart attacks later that day and into the morning of March 13, 2007. Ultimately, Lewis alleges that she had a cardiac stent implanted on the morning of March 13, 2007, at Providence Hospital. On December 11, 2007, the Air Force Legal Operations Agency denied Lewis' tort claims. On May 15, 2008, Lewis moved to amend her complaint and lodged a copy of the complaint with this court, which granted Lewis' motion to amend on June 16, 2008. Lewis filed her amended complaint on July 9, 2008.

On January 5, 2009, the government moved to dismiss all of Lewis' state law tort claims on the ground that Lewis' claims (1) are untimely, (2) are preempted, and (3) are insufficient as a matter of law. Lewis opposed this motion on February 10, 2009, and noted that because the government attaches exhibits to its motion, the government's motion is more likely a motion for summary judgment. As a result, Lewis submitted various exhibits with her opposition brief contesting the authenticity of some of the government's exhibits. The government replied on March 12, 2009 and, at the same time, moved for leave to file additional factual materials. On March 30, 2009, Lewis opposed this motion on the ground that the government's motion for leave establishes that the government's exhibits are inauthentic. In addition, on March 31, 2009, Lewis moved for summary judgment as to liability on her retaliation claim under 42 U.S.C. § 2000e-3(a), which the government opposed on April 20, 2009. The government also cross-moved for partial summary disposition of Lewis' retaliation claim. Lewis opposed the government's cross-motion on May 4, 2009. Finally, the government moved for an

extension of time to file motions *in limine* and dispositive motions.  The court considers the parties' various motions below.

### III.  STANDARDS OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), a party may seek dismissal of an action for lack of subject matter jurisdiction.  "A federal court has subject matter jurisdiction over an action that either arises under federal law, or when there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000."[2]  When subject matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the defendant's motion to dismiss.[3]  "A plaintiff suing in a federal court must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction, and, if he does not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment."[4]  Motions to dismiss under Rule 12(b)(1) "may be used to attack two different types of jurisdictional defects" - facial insufficiency or factual insufficiency.[5]  Facial attacks challenge the sufficiency of the pleading pursuant to Rule 8(a)(1), "which means that the allegations in the complaint are insufficient to show that the federal court has jurisdiction over the subject matter of the case as [Rule 8] requires."[6]  A factual attack, on the other hand, permits the movant to challenge the substance of the jurisdictional allegations[7] and the court to consider litigation affidavits

---

[2]*Tosco v. Comtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2000) (citing 28 U.S.C. §§ 1331, 1332(a)).

[3]*Tosco*, 236 F.3d at 499.

[4]*Smith v. McCullough*, 270 U.S. 456, 459 (1926).

[5]*White v. Lee,* 227 F.3d 1214, 1242 (9th Cir. 2000); *see also* 5B Wright and Miller, Federal Practice and Procedure: Civil 3d § 1350 (2004) (hereinafter, "Wright and Miller").

[6]Wright and Miller § 1350.

[7]*Id.*

-14-

or other appropriate evidence to resolve disputes concerning jurisdiction.[8]  Once a factual attack is made, a district judge may examine evidence presented by both parties to determine whether jurisdiction exists.[9]  "Conversely, the pleader may establish the actual existence of subject matter jurisdiction through extra-pleading material."[10]

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show that material facts are not genuinely disputed.[11]  To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[12]  Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue exists by presenting evidence indicating that certain facts are so disputed that a fact-finder must resolve the dispute at trial. [13] The court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party.[14]

## IV.  DISCUSSION

Before moving to a discussion of the various pending motions, it is necessary to clarify Lewis' claims.  Lewis' third amended complaint includes ten claims: Claims I and III, for disparate impact in hiring and promotion pursuant to 42 U.S.C. § 2000e-2(a)(1),

---

[8]*McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

[9]Wright and Miller § 1350.

[10]*Id.*

[11]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[12]*Id.* at 325.

[13]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[14]*Id.* at 255; *Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006) (citation omitted).

are identical. Claims II and IV, for disparate treatment in segregation pursuant to 42 U.S.C. § 2000e-2(a)(2), are also identical. Although these claims are not at issue in any of the instant motions, the court finds that Claims III and IV may be stricken from Lewis' complaint as duplicative of Claims I and II, respectfully. Claim V, which is the subject of Lewis' motion at docket 118, addresses retaliation pursuant to 42 U.S.C. § 2000e-3(a). Claim VI, which is not at issue in the instant motions, alleges that Lewis was unlawfully removed from employment under 5 U.S.C. § 7702. Lastly, Claims VII though IX, Lewis' state law claims, seek to establish that defendants negligently and intentionally caused her emotional distress and that defendants negligently supervised their employees. These claims are the subject of the government's motion at docket 97. Finally, in Claim X, which is not at issue in the instant motions, Lewis seeks punitive damages. The court considers the parties's motions pertaining to Claims V and VII through IX below.

**A. Government's Motion to Dismiss Lewis' Tort Claims**

**1. Preemption**

The government argues that Lewis' tort claims are preempted on the ground that Lewis' proper recourse for inappropriate personnel actions and workplace discrimination lies under the Civil Service Reform Act ("CSRA") and Title VII, respectively. With respect to CSRA preemption, because Lewis has filed appropriate administrative actions with the EEO and the Merit Systems Protection Board ("MSPB"), and exhausted those remedies, the government contends that her tort claims are entirely duplicative of her federal claims and therefore preempted. Lewis counters that not all of her employer's actions fall under the umbrella of "personnel action," as required for CSRA preemption. Moreover, Lewis contests the government's characterization of the types of personnel action taken against her and the authenticity of core personnel documents submitted by the government. The government opposes Lewis' arguments in its reply brief and, in addition, moves for leave to file additional factual materials in opposition to Lewis' authenticity objections. With respect to Title VII preemption, the government argues that Title VII preempts Lewis' claims because her superiors acted within the outer perimeter of their authority and did not commit "highly personal wrongs," as required for Title VII preemption. Lewis counters that her employer's actions constituted

Case 3:06-cv-00053-JWS   Document 140   Filed 05/28/09   Page 16 of 24

a "highly personal violation" beyond the meaning of discrimination.   Because preemption arguments attack the jurisdictional sufficiency of Lewis' claims, the government's preemption arguments are assessed under Rule 12(b)(1).

### a. CSRA Preemption

The government first argues that Lewis' tort claims are preempted by the CSRA because the factual basis for Lewis' claims fall within the purview of "prohibited personnel practices," with which the CSRA is concerned.  Congress enacted the CSRA in 1978 to replace the old civil service system, which was an "outdated patchwork of statutes and rules built up over almost a century."[15]  The heavily criticized pre-existing system involved "haphazard arrangements for administrative and judicial review of personnel action" depending on an employee's classification and the type of personnel decision.[16]  By enacting the CSRA, Congress created "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration."[17]

This court described the CSRA's remedial scheme in its order at docket 55 as follows:

> "The CSRA provides a remedial scheme through which federal employees can challenge their supervisor's 'prohibited personnel practices.' If the conduct that plaintiff challenges in this action falls within the scope of the CSRA's 'prohibited personnel practices,' then the CSRA's administrative procedures are plaintiff's only remedy, and the federal court cannot resolve plaintiff's state law tort claims. 'The CSRA defines 'prohibited personnel practices' as any 'personnel action' taken for an improper motive by someone who has authority to take personnel actions. 'The CSRA reaches 'prohibited personnel practices' by '[a]ny employee who

---

[15]*United States v. Fausto*, 484 U.S. 439, 444 (1988) (internal quotation marks and citation omitted).

[16]*Id.*

[17]*Id.* at 445.

-17-

has authority to take, recommend, or approve any personnel action' 'with respect to an employee in ... a covered position in an agency.'"[18]

The CSRA further defines "prohibited personnel practices" as any "personnel action" taken by someone in authority that violates one of the enumerated practices.[19] "Personnel action" is "defined comprehensively to include any appointment, promotion, disciplinary or corrective action, detail, transfer, reassignment, reinstatement, restoration, reemployment, performance evaluation, pay or benefits decision, mandatory psychiatric examination, or any other significant change in duties, responsibilities, or working conditions."[20] A co-worker may commit a personnel action by recommending a course of action to a superior.[21] An employee's personnel-related complaints may be preempted even if no remedy is available under the CSRA.[22]

The questions before the court, therefore, are (1) whether Lewis' tort claims are based on any of the "prohibited personnel actions" within the CSRA's purview and (2) whether those actions were taken by someone with the authority to do so.[23] As an initial matter, the court agrees that Lewis' complaint is prolix and that categories of behavior must be defined. The court therefore overrules Lewis' objections to the government's characterization of her allegations and adopts the categories set forth in the government's brief at docket 97, which accurately summarize the allegations in Lewis' complaint. The first nine categories of purported "personnel actions" are summarized as follows: making hiring decisions based on race; giving Lewis negative

---

[18]Docket 55 at 7 (citing *Mahtesian v. Lee*, 406 F.3d 1131, 1134 (9th Cir. 2005) and *Orsay v. U.S. Dept. of Justice*, 289 F.3d 1125, 1128 (9th Cir. 2002)).

[19]*Mangano v. United States*, 529 F.3d 1243, 1247 (9th Cir. 2008) (citing 5 U.S.C. § 2302(b)).

[20]*Mangano*, 529 F.3d at 1247 (citing 5 U.S.C. § 2302(a)(2)(A)(i)-(xi)).

[21]*Mahtesian*, 406 F.3d at 1134.

[22]*Mangano*, 529 F.3d at 1246 (citations and internal quotations omitted).

[23]Based on the nature of Lewis' allegations, it is undisputed that each alleged action was prohibited. Lewis does not contend otherwise.

-18-

evaluations without providing feedback on how she can improve; giving better treatment to white employees; disciplining or criticizing Lewis when she did nothing wrong or disciplining her more severely than other employees; refusing to grant leave or forcing Lewis to find coverage when it was not her responsibility; giving Lewis too much work, making her perform tasks that should have been done by someone else, or failing to reassign work while she was on leave; forcing Lewis to supervise and/or discipline problem employees; refusing to accept medical certification for Lewis' leave and disciplining her for taking leave that was medically substantiated; and excluding Lewis from events and decisions she was entitled to participate in. Lewis does not dispute that the behavior encompassed in these nine categories falls within the definition of "personnel action."[24]

The government points to three additional categories of behavior that "do not immediately relate to personnel action listed in the CSRA" - (1) commanding officers refusing to investigate Lewis' allegations; (2) employees refusing to provide information that would expose misconduct; and (3) employees dealing with Lewis in a confrontational manner.[25] However, the government contends that these categories of behavior are nevertheless "work-related," arguing that categories (1) and (2) are work-related because they involve officers and employees failing to do what their jobs required and that category (3) is work-related because confrontations by management and employees were due to "disagreements about work issues and managerial decisions." Lewis responds that these actions could not be personnel actions because they constitute "highly personal" wrongs that have "the propensity to cause significant damage to the person above and beyond harm to his or her job." As an initial matter, by referencing "highly personal wrongs," Lewis conflates the Title VII and CSRA preemption standards. Whether an alleged personnel action is "highly personal" does not bear on CSRA preemption analysis. Regardless, category (3) allegations that Lewis was confronted or yelled at by management and employees constitute "personnel

---

[24]Docket 106 at 18.

[25]Docket 97 at 22.

-19-

actions" that were disciplinary or corrective in nature and related directly to Lewis' employment. The court does not believe, on the other hand, that Lewis' category (1) and (2) allegations - involving the failure of management to investigate and the failure of other employees to participate in the investigation of Lewis' complaints - constitute "personnel actions."[26]

The court must still consider whether the "personnel actions" discussed above were taken by individuals with authority. As an initial matter, the United States Attorney certified under 28 U.S.C. § 2679(d) that all of the then-individual defendants were acting within the scope of their employment.[27] Moreover, Lewis acknowledges that Fallon, DeShaiser, Bartz, Kobussen, Col. Dzubilo, Col. Lewis, Col. Douglas, and Lt. Col. Borgert, among others, held positions superior to her own and had authority to take personnel action. Although not in positions of authority, actions taken by Lewis' co-workers likewise constitute "personnel action" where their behavior influenced or affected the "personnel action" of one of Lewis' superiors.[28] Thus, to the extent Lewis' FTCA claims for intentional and negligent infliction of emotional distress and negligent supervision are based on behavior constituting "personnel action," those allegations are preempted by the CSRA.

### b. Title VII Preemption

With respect to the remaining two categories of behavior that do not constitute "personnel action" - involving commanding officers refusing to investigate Lewis' allegations and employees refusing to provide information that would expose misconduct - the court concludes that these allegations are nevertheless preempted by Title VII because they fall into the category of alleged retaliatory workplace action. As a federal employee, Lewis' exclusive remedy for claims of workplace discrimination lies within Title VII. As this court previously noted, an "official of the Government, acting

---

[26]These categories of behavior will be discussed further in the context of Title VII preemption. *See infra*.

[27]Docket 57.

[28]*Mahtesian*, 406 F.3d at 1134.

-20-

within the outer perimeter of his or her line of duty, is absolutely immune from state or common-law tort liability."[29]  One exception to his rule exists where such action constitutes a "highly personal" wrong that would support separate actionable relief.[30]  This court previously declined to rule on Title VII preemption "because doing so requires resolution of questions of fact" pertaining to whether federal employees were acting within the perimeter of his or her authority.  However, given that Lewis has presented no evidence in opposition to the government's factual attack on jurisdiction under Rule 12(b)(1) that would support claims that her superiors or co-workers were acting outside the outer perimeter of their authority, the court concludes that there are no longer factual questions standing in the way of Title VII preemption.

        As noted above, the United States Attorney has now certified under 28 U.S.C. § 2679(d) that all of the then-individual defendants were acting within the scope of their employment.[31]  Such a certification is conclusive unless challenged.[32]  "[T]he party seeking review bears the burden of presenting evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence."[33]  Lewis attempts to challenge the United States Attorney's certification in her affidavit at paragraphs 3-6 and 15-16, which essentially operates as an objection to the authenticity of Fallon and DeShasier's core personnel documents.  However, Lewis' affidavit, together with the other evidence submitted with her opposition brief, is plainly insufficient to rebut the presumption established by the United States Attorney's certification that the named defendants were acting within the scope of their employment.  Moreover, and more importantly, Lewis fails to allege any conduct that could be construed as falling outside "the outer perimeter of any

---

[29]Docket 55 (quoting *Otto v. Heckler*, 781 F.2d 754, 758 (9th Cir. 1986), *amended by* 802 F.2d 337 (9th Cir. 1986)).

[30]*Brock v. United States*, 64 F.3d 1421, 1424 (9th Cir. 1995).

[31]Docket 57.

[32]*Orsay*, 289 F.3d at 1132 (citing *Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1994)).

[33]*Green*, 8 F.3d at 698.

employee's duty" or cite any authority that would support her claim that any of the alleged actions of her supervisors or co-workers amounted to a "highly personal wrong."[34]  Lewis' attempts to liken her claims to the rape described in *Brock* and the assault described in *Orsay* simply fail.  Because the court does not find it necessary to rely on the core personnel documents to find that Fallon and DeShasier were acting within the scope of their employment, the government's motion for leave to file additional factual materials at docket 123 is denied as moot.  The court concludes that Lewis' remaining allegations - i.e., those which do not constitute "personnel action" by a federal employee - are preempted by Title VII.

### 2. Remaining Arguments

Because Lewis' FTCA claims are preempted by the CSRA and Title VII, the court need not consider the government's statute of limitations defense or arguments relating to the sufficiency of Lewis' tort claims.

## B. Lewis' Retaliation Claim

Lewis also moves for summary judgment on her retaliation claim under 42 U.S.C. § 2000e-3(a).  Specifically, Lewis argues that Col. Lewis' letter of September 19, 2005 amounted to retaliation for her EEO claims in that it discouraged her from seeking redress through the chain of command or engaging in the EEO process.  Lewis also alleges that Air Force policies specifically permit an employee subject to potentially adverse employment action to use the chain of command to seek redress.  The government points out that Lewis not only did not follow the appropriate chain of command, but that Col. Lewis encouraged her to use the EEO process to her advantage.  To establish a *prima facie* case of retaliation, Lewis must prove that (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.[35]  If Lewis meets her burden, the government must then articulate

---

[34]*Brock*, 64 F.3d at 1423-24.

[35]*Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093-94 (9th Cir. 2008); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

Case 3:06-cv-00053-JWS   Document 140   Filed 05/28/09   Page 22 of 24

some legitimate, non-discriminatory reason for adverse employment action.[36] If the government articulates such a reason, Lewis will then bear the ultimate burden of demonstrating that the reason offered was a mere pretext for a discriminatory motive.[37] Adverse employment action must be "reasonably likely to deter employees from engaging in protected activity"[38] - that is, the conduct must be "materially adverse."[39] "[P]etty slights or minor annoyances that often take place at work and that all employees experience" do not fall into the category of materially adverse employment action.[40]

Here, Lewis argues only that Col. Lewis' letter dated September 19, 2005, which encouraged Lewis to exhaust her administrative remedies and let the EEO process "work for [her]," constituted adverse action that deterred her from bringing her claim up the chain of command and from participating in the EEO process. The court disagrees. As an initial matter, the letter does not state that Lewis cannot utilize the chain of command approach. Rather, Col. Lewis indicated that because Lewis had already filed an EEO claim, intervention by himself or other individuals who could be involved in the fact-finding process "would negate the impartiality and integrity of the program of checks and balances of the EEO process." Col. Lewis' letter encouraged Lewis to pursue her claims with the EEO - indeed, Lewis continued to work on her EEO complaint even after receiving Col. Lewis' letter. Furthermore, Lewis' contention that Col. Lewis' letter effectively denied her the ability to utilize the chain of command to seek redress is plainly mistaken. As the government notes, Lewis herself avoided the chain of command approach, filed her EEO complaint, and sought redress with Col. Lewis before allowing others in the chain time to respond to her complaints. Therefore, to the extent Lewis' retaliation claim is based on this letter, it fails. However, because there

---

[36]*Davis*, 520 F.3d at 1094.

[37]*Ray*, 217 F.3d at 1240.

[38]*Id.* at 1242.

[39]*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[40]*Id.*

-23-

are other allegations in Lewis' complaint that could feasibly support Lewis' retaliation claim, the court declines to dismiss Lewis' retaliation claim at this time.

**C. Remaining Motions**

Given that Lewis and the government appear to have run out of time to file discovery and pre-trial motions, any remaining dispositive or discovery motions must be filed within 30 days of the date of this order.[41]  The court therefore denies the parties' motions to extend deadlines as moot.


## V.  CONCLUSION

For the above reasons, the court rules as follows: (1) the government's motion at docket 97 is **GRANTED**; (2) the government's motion at docket 114 is **DENIED** as moot; (3) Lewis' motion for summary judgment at docket 118 is **DENIED**; (4) the government's cross-motion for partial summary judgment at docket 126 is **GRANTED** with respect to Lewis' retaliation claim based on Col. Lewis' September 19, 2005 letter only; and (5) Claims III and IV of Lewis' complaint are stricken, *sua sponte*, as duplicative of Claims I and II, respectfully.  Any remaining dispositive or discovery motions must be filed within 30 days of the date of this order.  The government's motion to extend deadlines docket 123 is **DENIED** as moot.

DATED at Anchorage, Alaska, this 28th day of May 2009.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[41]The court notes that Lewis filed a motion to compel on May 1, 2009, one month beyond the deadline for discovery motions.  Because the court has extended the deadline for discovery motions, the court will review Lewis' motion to compel when it becomes ripe.